Per Curiam :
This case comes before the court on defendant’s exceptions to a recommended decision filed May 22, 1972, by Trial Judge David Schwartz pursuant to Buie 134 (h). The court has considered the case on the briefs and oral arguments of counsel for the parties and the amicus curiae. The court agrees with the decision as hereinafter set forth, rejects the objections and exceptions of defendant and amicus, and hereby affirms and adopts the decision as the basis for *873 its judgment in this case. Insofar as defendant and amicus curiae have presented arguments to the court which differ from those presented to the trial judge, the court has considered them but does not deem any change in the trial judge’s opinion or findings is called for. The court has, however, excised from the findings the trial judge’s notes which he indicates were not intended as findings.
Subsequent to the trial judge’s decision and the oral argument before the court, the Supreme Court decided Mattz v. Arnett, 412 U.S. 481 (1973). We consider the trial judge’s opinion and findings, and our decision herein, to be fully consistent with the opinion and decision in that case. Although the ultimate issues in the two cases are different, several aspects of the Supreme 'Court’s opinion tend substantially toward supporting our holding in the present case.
It is concluded, therefore, that certain of the plaintiffs are entitled to recover in amounts to be determined under Eule 131 (c), and the claims of the others are set down for retrial, as provided in findings 217-218. The case is remanded to the trial judge for further proceedings. The motion of the Hoopa Valley Tribe to intervene is granted.
OPINION OE TRIAL JUDGE
Schwartz, Trial Judge:
In 1876 a 12-mile square tract of land in Northern California, on the last reach of the Trinity Eiver before it joins the Klamath Eiver, was set aside by order of President Grant as the Hoopa Valley Indian Eeservation. Most but not all of the Indians of the tract, called the Square, were and have been Hoopa Indians. In 1891 President Harrison made an order extending the boundaries of the reservation to include an adjoining 1-mile wide strip of land on each side of the Klamath Eiver, from the confluence of the two rivers to the ocean about 45 miles away (in consequence of which the reservation took on the shape of a square skillet with an extraordinarily long handle). Most of the Indians of the added tract, called the Addition, were and have been Yurok Indians, also known as Klamaths.
The Square is heavily timbered and in the last 20 years the *874 timber on its unallotted trust-status lands bas begun to produce revenues of about $1 million annually. These revenues, administered by the United States as trustee for the Indian beneficial owners, have been divided by the Secretary of the Interior exclusively among the persons on the official roll of the Hoopa Valley Tribe, an organization created in 1950, whose membership rules limit enrollment to allottees of land on the Square, non-landholding “true” Hoopas voted upon by the Tribe, and long-time residents of the Square of a prescribed degree of Hoopa blood, descended from natives of the Square.
The plaintiffs are 3,323 Indians, in the main Yuroks of the Addition and their descendants, who are ineligible for membership in the Hoopa Valley Tribe and have thus been denied a share in the revenues from the Square. They bring this suit against the United States as their trustee for a money judgment for their alleged share in the timber income, claiming it as all-reservation property. The Hoopa Valley Tribe, in a sense the real party defendant, is present in the case as an amicus curiae aligned with the defendant; the position of the Government and the Tribe are identical and the two have filed joint briefs. (References to defendant or to the Government will therefore mean the Hoopa Valley Tribe as well.)
To simplify the litigation, the cases of 26 plaintiffs believed to be representative of the 3,323 were chosen for trial with the expectation that if the plaintiffs as a group were upheld on the common issue, resolution of the sample cases would develop standards by which the parties could dispose of many or most of the remaining cases. The first order of business is therefore the basic issue of whether the Indians of the Addition may be excluded from sharing in the revenues of the communal lands of the Square.
The history of the reservation may be succintly stated: It was established in 1864 pursuant to the Act of April 8,1864, 13 Stat. 39, its boundaries were in 1865 provisionally determined to be what has since been called the Square, formally so defined by an order of President Grant in 1876 and extended to include the Addition by order of President Harri *875 son in 1891. The act of 1864 is the basis of the claims of all parties. No claim is made of any title or right antedating or overriding the statute or the authority exercised thereunder.
The plaintiffs contend that as Indians of the Addition, they are entitled to share in the resources of the entire reservation, including the Square. The enlargement of the reservation in 1891 formed, they maintain, a single, integrated reservation to which all the Indians on both the Square and the Addition got equal rights in common. The contrary position of the Government is that the Square survived the enlargement of the reservation in 1891 as an entity whose resident Indians had vested substantive rights, exclusive as against the Indians of the Addition. The executive order of 1891, the Government says, joined the Square and the Addition for administrative purposes only, not for purposes of substantive rights, and without effect on already vested rights of the Indians of the Square, now organized as the Hoopa Valley Tribe. The controversy is decided here in favor of plaintiffs, for the reasons which follow.
On August 21,1864, Austin Wiley, the federal Superintendent of Indian Affairs for California, in a public notice “located” a reservation, to be called the “Hoopa Valley Beservation,” “situated” on the Trinity Biver in Klamath County.[1] A second notice in February of the following year defined the boundaries of the “Hoopa Beservation” as a square tract bisected by the last 12 miles of the Trinity Biver before its junction with the Klamath and extending 6 miles on each *876 side of tbe Trinity.[2] Eleven years later, on June 28, 1876, President Grant in an executive order precisely defined tbe “exterior boundaries” of tbe “Hoopa Valley Indian Reservation” in accordance with a survey, and declared that the 89572.43 acres embraced tberem were “set apart for Indian purposes, as one of tbe Indian reservations authorized to be set apart, in California, by act of Congress approved April 8, 1864.”[3] The circumstances surrounding tbe establishment and enlargement of the reservation are described in the accompanying findings of fact.
Neither the public notices of 1864 and 1865 nor the executive order of 1876 mentioned any Indian tribe by name, nor intimated which tribes were occupying or were to occupy the reservation. In this they were consistent with the statute whose authority was being exercised, the Act of April 8,1864, *877 13 Stat. 39. That act, cited by both, public notices and by the executive order, authorized the President in his discretion to locate not more than four Indian reservations in California, at least one of them to be in the northern district of the state, of such extent as he deemed suitable for the acconnnodation of the Indians of the state, all without mention of any tribe by name.
Section 2 of the act read as follows (13 Stat. 40):
Sec. 2. That there shall be set apart by the President, and at his discretion, not exceeding four tracts of land, within the limits of said state, to be retained by the United States for the purposes of Indian reservations, which shall be of suitable extent for the accommodation of the Indians of said state, and shall be located as remote from white settlements as may be found practicable, having due regard to their adaptation to the purposes for which they are intended: Provided, That at least one of said tracts shall be located in what has heretofore been known as the northern district: * * * And provided, further, That said tracts to be set apart as aforesaid may, or may not, as in the discretion of the President may be deemed for the best interests of the Indians to be provided for, include any of the Indian reservations heretofore set apart in said state, and that in case any such reservation is so included, the same may be enlarged to such an extent as in the opinion of the President may be necessary, in order to its complete adaptation to the purposes for which it is intended.
The powers conferred by this statute are to be construed in keeping with the broad connotations of the words employed: “at his discretion,” “suitable extent,” “accommodation of the Indians,” “practicable” and “due regard.” South Puerto Rico Company Trading Corp. v. United States, 167 Ct. Cl. 236, 260-61; 334 F. 2d 622, 631-32 (1964), cert. denied, 379 U.S. 964 (1965). It is not disputed that the President had complete discretion as to which tribes were to be located on any of the reservations. The number of the tribes to occupy a reservation was also a matter for Presidential decision. There were many Indian tribes in California; in the north, in the area of the Hoopas and the Yuroks, almost every river and creek had its own tribe. Since there were to be no more than four reservations in the state — less, if the President so decided — it was in *878 evitable that each reservation could and almost certainly would be occupied by more than one tribe. How many tribes was left to the President; the President would in his discretion adjust the size of a reservation to the number of tribes and Indians to be accommodated.
Given such a statutory scheme, faithfully reflected by the omission of reference to any Indian tribe in the notices of 1864-G5 and the executive order of 1876, the Hoopa Indians could get no vested or preferential rights to the Square from the fact alone of being the first or among the first to occupy the Square with Presidential authority. The sequence in which tribes were authorized to occupy a reservation gave no rights. Any exercise of the President’s discretion in favor of the Hoopas, in approving their residence on the reservation, gave the Hoopas no vested rights as against such other tribe as might be the beneficiary of a simultaneous or subsequent exercise of the President’s discretion. Hynes v. Grimes Packing Co., 337 U.S. 86, 103 (1949); Healing v. Jones, 210 F. Supp. 125, 138, 153, 170 (D. Ariz. 1962), aff’d 373 U.S. 758 (1963); Crow Nation v. United States, 81 Ct. Cl. 238, 278 (1935).
It is claimed by defendant, however, that the Ploopas were the sole aboriginal occupants of the Square. The legal consequences were this claim upheld, as against the statute and the President’s authority, need not be gone into, for the claim of fact is unfounded. The accompanying findings recount that the Hoopas shared the Square with at least some Yuroks, whose native villages ranged along the Klam'ath Fiver from the ocean to the Trinity — the area later to become the Addition — to the banks of the Trinity near the Klamath. This conclusion of fact as to the presence of Yuroks on the Square prior to white settlement does not, of course, support the claim of the present plaintiff Yuroks of the Addition, who were not introduced into the reservation until 1891, but it does negate the claim of the defendant insofar as it is based upon original exclusive Hoopa occupancy of the Square.
Another contention is that vested rights in the Square were conferred upon the Hoopas under a treaty made by *879 Wiley at the time be established the reservation in 1864. This treaty, which made peace with the Iloopas and several other tribes then at war with the United States, obligated the United States “to set aside for reservation purposes for the sole use and benefit of the tribes of Indians herein named, or such tribes as may hereafter avail themselves of the benefit of this treaty, the whole of Hoopa Valley, to 'be held and used for the sole benefit of the Indians whose names are hereunto affixed as the representatives of their tribes.” It is conceded that this promise was not a treaty in the constitutional sense. Its making was not authorized, and it was not ratified. Its text is found as an attachment to a report by Wiley printed in the annual report for 1864 of the Superintendent of Indian Affairs; it is there captioned “Treaty of peace and friendship between the United 'States government and the Hoopas, South Fork, Redwood, and Grouse Creek Indians.”
Putting aside any question of the binding quality of this document, it is not properly to be read as having sought to restrict the President’s discretion under the act of 1864 or to give rights in the reservation to some tribes and withhold them from others. Within the week of the making of the treaty, Wiley in his first public notice locating the “Hoopa Valley Reservation” described the reservation only as an “Indian reservation” without any reference to who should occupy it. In the setting in which the treaty was presented to the Indians who agreed to it, described in the accompanying findings, the treaty is properly to be construed as a promise to devote Hoopa Valley to an Indian reservation for those tribes that would cease their hostilities 'and live at peace with the United States. So understood, the Klamaths or Yuroks were among its beneficiaries, for they laid down their arms and thenceforth remained at peace with the United States. There is good ground for concluding that though the caption of the treaty did not mention the Kla-maths (Yuroks) as original parties, they were entitled to its benefits as among the tribes to whom the treaty was in fact presented and who were thereby persuaded to lay down their arms.
*880 It is perfectly plain that from the outset in 1864 all involved understood that the reservation was intended for an undetermined number of tribes including the Hoopas and the Klamaths, and that the authorities repeatedly acted on this assumption. Sbme Yuroks already lived in the Square in 1864 and others were soon settled there, according to the best data on the peoples of the reservation. Within a fortnight of his first notice locating the reservation, Wiley reported the precise names of the tribes occupying every reservation in California except the Hoopa Valley Reservation; the Hoopa Valley Reservation, he said, contained “Various tribes.” Soon thereafter Hoopas, Klamaths, and Redwoods appear as residents of the reservation. Saiaz, Wiyot, Wylaclde and Sinkyone Indians were moved to the reservation from elsewhere (and apparently did not remain, at least identifiably). In 1869 Wiley’s successor had a plan (not executed, for reasons which do not appear) to move 1800 Klamath Indians to the reservation. The Klamath River Reservation (occupied by Yuroks and constituting the ocean end of what later became the addition to the Hoopa Valley Reservation) had been destroyed by flood in 1861, and efforts to resettle its Indians, Yuroks, had not been successful. The 1800 Klamaths were thus probably the forebears of the present plaintiffs.
The annual report of the Commissioner of Indian Affairs for 1872 stated that the Indians in the care of the agency at Hoopa Valley were the Humboldts (Wiyots and others), Hoonsoltons, Miscolts, Saiaz and several other bands, numbering 725. The reservation on the Trinity, the Commissioner said, “was set apart per act of April 8, 1864, for these and such other Indians in the northern part of the State as might be induced to settle there.” And in the years between the executive orders of 1876 and 1891 the Commissioner’s annual reports contained la table giving the names of the tribes “occupying or belonging” to the various reservations. For the Hoopa Valley Reservation, the tribal names given were Hunsatang, Hoopa, Klamath River, Redwood, Saiaz, Sermal-ton, Miskut and Tishtanatan. During all these years, therefore, it was well understood that the reservation contained *881 several tribes and was intended for whatever tribes might be settled there by authority of the President.
When, therefore, President Harrison by executive order of October 16,1891 extended the boundaries of the reservation to include the contiguous strip of land along the Kla-math Eiver, there were no vested rights to the Square incapable of divestment, or at least dilution, by a Presidential introduction of additional tribes into the reservation. There could be no such rights in view of the President’s authority under the act of 1864 and the manner of its exercise to that time.
The terms of the executive order (text in the note[4]) described the reservation as created under the act of 1864, and “extended” its “limits” “so as to include” the tract since called the Addition. No qualification was imposed on the incorporation of the Addition into the reservation, except that tracts on the Addition privately owned under the land laws were “excluded from the reservation as hereby extended.”
Such words in an executive order, in this respect no different than the statute by whose authority it was made, are “to be read in their natural and ordinary sense, giving them a meaning to their full extent and capacity, unless some strong reason to the contrary appears (Miller v. Robertson, 266 U.S. 243, 250 (1924)).” No reason to the contrary appearing, the order is to be given its natural effect of granting to the Indians of the Addition, as Indians of the enlarged reservation, rights in the reservation equally with the Indians of the Square.
The order has been held to be a lawful exercise of the President’s “continuing authority,” under the act of 1864, within *882 his “large discretion” concerning the exercise of that authority, to “alter and enlarge” the reservation “from time to time in the light of experience.” Donnelly v. United States, 228 U.S. 248, 256-57 (1913). The President had no less power to enlarge a reservation created under the act of 1864 than he had to locate it originally. Five prior Presidents — Presidents Grant, Playes, Garfield, Arthur land Cleveland — the Supreme Court noted, had made similar orders, with respect to the reservations authorized by the act, “altering and enlarging the bounds of the reservations, restoring portions of their territory to the public domain, and abolishing reservations once made and establishing others in their stead; and in numerous instances Congress in effect ratified such action.” Donnelly v. United States, supra at 258.
As already noted, the plain and natural consequence of the order was the creation of an enlarged, single reservation incorporating without distinction its added and original tracts upon which the Indians populating the newly-added lands should reside on an equal footing with the Indians theretofore resident upon it. This the President was as free to do under the reserved powers granted him by the act of 1864 as he had been free in the early years, without enlarging the reservation, to settle Redwoods, Saiaz and others and as he would have been free in 1869 to settle upon the reservation the Yuroks of the Klamath River Reservation. In introducing the Yuroks of the Addition into the enlarged reservation in 1891, on a basis of equality with their kinsmen and the several other tribes already there, the President was merely continuing to accommodate the tribes of the area in the Indian reservation in Northern California he had established under the act of 1864. Compare Halbert v. United States, 283 U.S. 753 (1931) and Quinaielt Tribe v. United States, 102 Ct. Cl. 822 (1945), on the President’s power to enlarge a treaty reservation for the common benefit of the tribe originally settled there and tribes “in that locality.”
Although the purpose of the executive branch in enlarging the reservation would seem to be apparent from the facts, the defendant reaches a different result entirely; it contends that the purpose of the executive order was to join the parts *883 of the enlarged reservation only technically, for administrative purposes only, the Indians of each tract to retain their rights in their respective tracts. No hint of such a purpose appears on the face of the executive order. And no support for such purpose appears in the data said 'by defendant to prove it — the background and origins of the executive order and of legislation affecting the Klamath Eiver Reservation, a part of the Addition. Am exhaustive inquiry into the data, set out in detail in the accompanying findings, fails to reveal even a mention of such a purpose as defendant 'asserts, much less the compelling showing which would be required to curtail the ordinary consequences of the executive order.
The executive order originated in the Administration’s desire to give reservation status to the Connecting Strip and the Klamath Eiver Reservation, the latter then recently held by the courts to be an abandoned Indian reservation and threatened by Congress with a bill for its public sale. The object was to provide the legal basis for expulsion of white traders from the area and for the allotment of land in sev-eralty to the Indians of the area, under the General Indian Allotment Act of February 8, 1887 as amended (24 Stat. 388,26 Stat. 794). Any qualification on the incorporation of the Addition into the reservation would have jeopardized the desired status, for only four reservations were permitted in California under the act of 1864 and four were already in existence. Full reservation status could come only from a bona fide merger of the Addition into the reservation, not a “technical” joinder, “for administration only,” of a reservation with a dubious status to one of lawful status. In the enlarged reservation resulting from such a merger, there could be only equal rights for all Indians of the reservation.
Administrative opinions, in the years following the executive order of 1891, recognized both that a number of tribes including Klamaths, Hoopas and other tribes were entitled to rights on the reservation and, with pointed relevance to the instant case, that the Indians of the Addition and the Square were equal in respect to rights in the lands of the Square. These opinions are described in the accompanying findings. In one of them, in 1916, it was ruled that the *884 Hoopas, Klamaths and several other tribes were entitled to rights on the reservation. In another, in 1933, it was determined that allotments of land on the Square should cease, and assignments of land contingent on cultivation be substituted, because, it was held, the Indians of the Addition and the Square were equally entitled to allotment of lands and there was insufficient land for all those entitled.
Defendant 'attacks these rulings as erroneous, as made by men of lesser rank and as covering only a short span of years. The rulings were sound, they were made by, 'among others, a Commissioner, a Chief Clerk of the Indian Office in 1916 (then the officer third in rank, next after the Assistant Commissioner), and they were made whenever there was need for them. No contrary ruling worth the mention was made in the Department of the Interior until the Secretary in 1955 began to pay the income from the Square to the Hoopa Valley Tribe and the Deputy Solicitor in 1958 wrote an opinion justifying the legality of his action. 65 Dec. Int. Dept. 59 (1958). That opinion is not supported by the defendant; the opinion does not reflect the facts found here, primarily the nonexclusive nature of the Hoopas’ residence in the Square, and it proffers neither tangible support nor rational theoretical basis for its assertion that the executive order of 1891 was intended only for administrative convenience.
The baseless belief that the Indians of the Square had exclusive rights in the lands of the 'Square seems to have grown from the remoteness of the Addition from the Square, the roughness of the terrain of the former, and the different stock of their respective inhabitants. The error flowered during the inordinate delay — from 1894 to 1922 — between the time of allotment of Addition lands and allotment of land on the Square. The Indians of the Square, deprived for so long of allotments, became understandably jealous and possessive for the entire Square.
The 1891 executive order, however, withstands all attacks. It was fully authorized by the act of 1864. No vested Indian rights in the Square existed, and the effect of the order was to enlarge both the area and the population of the reserva *885 tion, without any limitation on the rights of all the Indians in the communal lands of the enlarged reservation.
Turning to the cases of the 26 individual plaintiffs, stated in detail to the findings, it appears that 22 of them, named in the accompanying ultimate findings and conclusions, are sufficiently proven to be Indians of the reservation to warrant a determination now that they are entitled to recover, in amounts to be calculated after all the 3,323 claims are tried and determined. In the cases of the remaining four, there are questions — of possible loss of reservation rights or of degree of Indian blood — as require that their cases be retried or rebriefed, as seems indicated in each case. With the common issue of exclusive right out of the way, the parties through their counsel will presumably be able to address themselves to the individual claims, and agree upon standards for the recognition of individual claims. There should be no reason to insist upon a formal appearance by each claimant in court. Sworn testimony may be given by affidavit or in the equivalent of a deposition, followed by stipulation for judgment where no contest is planned.
FINDINGS OP PACT*
1855-64 — The Klamath River Reservation
1. On November 16,1855 the President directed that there, be set aside in Northern California, as the Klamath River Reservation, “a strip of territory commencing at the Pacific Ocean and extending 1 mile in width on each side of the Klamath River” for a distance of approximately 20 miles, not to exceed 25,000 acres.
The President acted pursuant to the Act of March 3,1853 (10 Stat. 226, 238), as amended March 3,1855 (10 Stat. 686, 699), which authorized the creation of seven military reservations in California or in the Territories of Utah and New Mexico.
2. In Northern California the Klamath River first flows *886 southwest to its junction with, the Trinity River (which flows north and is essentially a branch of the Klamath) and then, veering sharply to the northwest, continues to the ocean. The two rivers thus form a Y whose arms are the Klamath and whose trunk is the Trinity. The Klamath River Reservation, on the upper half of the Y’s left arm, extended upstream, from the ocean, for half the distance of the left arm to about 25 miles from the junction of the two rivers.
3. At the time of its creation in 1855, the Klamath River Reservation was occupied by about 2,000 Indians of the Yurok tribe, also known as Klamaths.
“Klamath,” the name also of a more northerly group of Indians in Oregon, is as used herein and in the documents considered herein the name of the Indians resident, generally speaking, in the basin of the Klamath River in Northern California.
4. The tribe of Klamaths living down river on the Klamath were the Yuroks. Yurok means down river. Those living up river (roughly speaking beyond the Trinity’s junction with the Klamath) were the Karoks. Karok means up river. Sometimes Yuroks are called Lower Klamath Indians, the adjective “lower” meaning they live below the junction of the two rivers.
The Indian tribes of Northern California were not organized or large entities; Indians resident on a particular river or fork were a “tribe.” Tribal names were often applied inexactly and usually meant only a place of residence. To call an Indian a “Hoopa” or a Trinity Indian meant he was an Indian resident in the valley of the Trinity called Hoopa. The names “Yurok” and “Karok,” as seen above, also meant a place of residence.
“Hoopa” is used herein instead of its other forms, “Hupa” and “Hoopah.” References to Iloopas and the Hoopa tribe should be distinguished from the membership of the Hoopa Valley Tribe, the amicus curiae, an organization created in 1950 with intricate membership rules.
5.The native villages of the Lower Klamaths or Yuroks were located on the Pacific coast from Wilson Creek, north of the mouth of the Klamath, to Little River, south of the Klam- *887 ath, along the Klamath. Eiver from its mouth to Bluff Creek, located a short distance upstream from the Klamath-Trinity junction, and (of particular significance in this case) hi the canyon of the Trinity Eiver in the most northerly part of the river near the junction of the Trinity with the Klam-ath and in a village a small distance from the Trinity.
6. The native villages of the Upper Klamath Indians of Karoks were along the upper Klamath, from a point just above Bluff Creek, upstream to Indian Creek. Weitchpec, a village at the junction of the two rivers, is often treated as the dividing point, and is allotted to the Yuroks.
7. Following the creation of the Klamath Eiver Eeservation, Indians of other tribes were moved to the reservation, among them 500 Tolowa Indians brought in 1856 from their native territory on the Smith Eiver near the Oregon border. By 1858, a large majority of these Tolowas returned to their former territory.
8. In 1861, the Klamath Eiver Eeservation was flooded, and nearly all the arable land was destroyed. The Superintendent and a number of the Indians of the reservation moved to the Smith Eiver Indian Eeserve on the Smith Eiver near the Oregon boundary. Since the Klamaths lived principally on the salmon in the river, a substantial or greater number of them refused to leave and remained in the area and in the area further up river. Many of those who moved to the Smith Eiver Eeservation soon or eventually returned to their former territory on the Klamath.
9. Because the following findings turn away from the Klamath Eiver Eeservation to the establishment of the Hoopa Valley Eeservation and do not return to the Klamath Eiver Eeservation until 1891, a brief foresight is given: Those Indians who remained on the Klamath Eiver Eeser-vation eventually came under the supervision of the Indian Agency for the area, located at the TIoopa Valley Eeservation on the Trinity Eiver southward from its junction with the Klamath, after that reservation was provisionally located in 1864. Thereafter, in 1891, the Hoopa Valley Eeservation was enlarged, by executive order, to include not only the Klamath Eiver Eeservation but the connecting strip of land along the Klamath Eiver between the two reservations.

*888
The Act of April 8,1864

10. The Act of April 8,1864 (13 Stat. 39), the source of all r.bi.ims herein and of central importance in this case, authorized the President in his discretion to set aside “not exceeding four tracts of land” within the State of California, at least one of them to be in the northern district, “for the purposes of Indian reservations,” to be located “as remote from white settlements as may be found practicable.” The reservations were to be “of suitable extent for the accommodation of the Indians of said state” and they were to include, in the President’s discretion, any existing Indian reservations, “enlarged to such an extent as in the opinion of the President may be necessary.” The remaining several reservations in California were to be surveyed into lots and offered for public sale.
The text of the relevant portion of the Act is as follows (13 Stat. 40):
Sec. 2. And be it further enacted, That there shall be set apart by the President, and at his discretion, not exceeding four tracts of land, within the limits of said state, to be retained by the United States for the purposes of Indian reservations, which shall be of suitable extent for the accommodation of the Indians of said state, and shall be located as remote from white settlements as may be found practicable, having due regard to their adaptation to the purposes for which they are intended: Provided, That at least one of said tracts shall be located in what has heretofore been known as the northern district : And provided, further, That if it shall be found impracticable to establish the reservations herein contemplated without embracing improvements made within their limits by white persons lawfully there, the Secretary of the Interior is hereby authorized and empowered to contract for the purchase of such improvements, at a price not exceeding a fair valuation thereof, to be made under his direction. But no such contract shall be valid, nor any money paid thereon, until, upon a report of said contract and of said valuation to Congress, the same shall be approved and the money appropriated by law for that purpose: And provided, further, That said tracts to be set apart as aforesaid may, or may not, as in the discretion of the President may, be deemed for *889 the best interests of the Indians to be provided for, include any of the Indian reservations heretofore set apart in said state, and that in case any such reservation is so included, the same may be enlarged to such an extent, as in the opinion of the President may be necessary, in order to its [sic] complete adaptation to the purposes for which it is intended.
Sec. 3. And be it further enacted, That the several Indian reservations in California which shall not be retained for the purposes of Indian reservations under the provisions of the preceding section of this act, shall, by the commissioner of the general land-office, under the direction of the Secretary of the Interior, be surveyed into lots or parcels of suitable size, and as far as practicable in conformity to the surveys of the public lands, which said lots shall, under his direction, be appraised by disinterested persons at their cash value, and shall thereupon, after due advertisement, as now provided by law in case of other public lands, be offered for sale at public outcry, and thence afterward shall be held subject to sale at private entry, according to such regulations as the Secretary of the Interior may prescribe: * * *
11. Shortly after the passage of the act, Austin Wiley, already in the service of the Indian Bureau in California, was appointed Superintendent of Indian Affairs for California and directed to give his immediate attention to the matter of the location of the four reservations authorized by the act, so that the Department of the Interior could have the benefit of his judgment in making the locations.

First Location of a Reservation in Hoopa Valley

12. At that time a number of Indian tribes of Northern California had for some years been at war with the forces of the United States. Many Indians had been taken prisoner. Other warriors, headquartered in Hoopa Yalley, were willing to surrender. On his appointment Wiley proceeded to Hoopa Yalley, treated with the tribes there represented, and there located a reservation by the public notice set out in the following finding.
13. On August 21,1864, Superintendent Wiley gave public notice that he had located an Indian reservation, to be known as the Hoopa Yalley Reservation, on the Trinity River in *890 Klamath County, California, the boundaries to be thereafter prescribed.
The notice in its entirety read as follows:
. By virtue of power vested in me by an act of Congress approved April 8, 1864, and acting under instructions from the Interior Department, dated at Washington city, D.C., April 26, 1864, concerning the location of four tracts of land for Indian reservations in the State of California, I do hereby proclaim and make known to all concerned that I have this day located an Indian reservation, to be known and called by the name and title of the Hoopa Valley Reservation, said reservation being situated on the Trinity river, in Klamath county, California, to be described by such metes and bounds as may hereafter be established by order of the Interior Department, subject to the approval of the President of the United States.
•Settlers in Hoopa valley are hereby notified not to make any further improvements upon their places, as they will be appraised 'and purchased as soon as the Interior Department may direct.
AustiN Wiley,

Sup't Indian Affairs for the State of California.

Fort G-aston, Cat., August 81,1864•
14. The Klamath County of that day, in which the new reservation was located, has since been largely added to present-day Humboldt County. Irregularly shaped, it included the area north and south of the Klamath above its junction with the Trinity and stretching eastward to the Salmon River, the area north and south of the Klamath below its junction with the Trinity to 'about the beginning of the Klamath River Reservation, and the territory contained within a line drawn along the Klamath for the extent of the Klamath River Reservation, then going southward along the coast to about the mouth of the Mad River, then going due eastward to about the southerly point of the Hoopa Valley Reservation and then, irregularly, going further east. See the map entitled Colton’s California, published by J. H. Colton, 1864, available at the Library of Congress.
In terms of the Y mentioned above, Klamath County included the territory west of the left aim and trunk, to the ocean, the territory east of the right arm and trunk, to be *891 yond the Salmon Biver, substantial territory north, of the Y!s right arm, and north of its left 'arm to the inland end of the Klamath Biver Beservation. The comity thus included a great part of the native territory of the Klamath Indians (see findings 5, 6, supra).
The “Treaty” Made in Hoopa Valley in 1864
15. A “treaty” made by Wiley with the Indian tribes at the time he located the reservation appears as an attachment to a report Wiley wrote on August 29,1864, some days after his public notice. The report and the attached documents are set out as they appear in the annual report of the Commissioner of Indian Affairs for 1864:
Office of Indian Affairs,
San Francisco, California, August 29,1864.
Snt: On the 2d ultimo I informed you that I would start for the north for the purpose of making some kind of a settlement with the hostile Indians in the Humboldt military district. The headquarters for the Indians who have been engaged in the war in that portion of the State for 'five years past is Hoopa valley, on the Trinity river. I arrived there on the 10th ultimo, and found most of the hostile Indians in the valley, with their guns still in their hands, waiting my arrival.
They had been induced to come in by the officers commanding the district, under promise of protection until terms could be arranged; but so cunning were they, and so suspicious of white men, that they kept most of their guns hid, and were constantly on the alert, ready to break to the mountains in case any effort should be made to remove them to a reservation. They protest that they prefer death or starvation in the mountains to removal.
I found among the leaders, and those having the most influence, young men, those that I had known as boys, most of whom have had more or less experience among white men as packers, herdsmen, farmers, &c. They all speak English and are intelligent. They make dangerous enemies, but I have every reason to believe they will comply with every obligation they have subscribed to if I keep my faith with them. The old Indians used their influence against giving up guns, and protested that I would lie to them, as other agents had done; but the influence is now all in the hands of the younger or “second *892 crop” Indians. They are the ones to be conciliated; peace with them secures peace with all. Enclosed you will find copy of a treaty I proposed, and which they finally accepted. From the 16th to the 21st they were busy. in delivering up their guns and pistols, many of them being hid out miles from the valley. On the 22d I issued the notice marked B, called a meeting of the settlers, and made known to them what terms I had offered the Indians to secure peace. They were all well satisfied, with, perhaps, the exception of two or three whose associations have been exclusively among the Indians. Several of the settlers will leave their places this fall, trusting to the government to pay them for their improvements.
The title to the whole of the lands in the valley is vested in the government, and as the improvements only are to be purchased, a very large sum will not be required. A good flouring mill and a fine saw-mill are there. The valley is beautifully located, surrounded by high mountains, well watered, with land enough in cultivation to feed all the Indians that are there or that may come there. Trinity river affords them fish during the spring and fall season, and the mountains on either side abound with acorns, berries, seed, &c.
At present there are about six hundred Indians in the valley. I appointed L. C. Beckwith a temporary special agent there at the request of the Indians themselves. I authorized him to assist them in building new houses, (their old ones having been burned during the war,) and to incur such expense as was absolutely necessary in preparing shelter for them before winter set in.
Enclosed please find a rough sketch of the valley; which, without being accurate in detail, will give you some idea of its situation and the location of the improvements.
I propose to take the whole of the valley and to the summit of the mountains on each side, which is about five miles. There are no improvements upon the proposed reservation excepting those within the valley.
I trust my action will be approved, and that no time will be lost by the department in having the improvements appraised. We shall want to commence ploughing there in November for our next year’s crop, and the sooner the citizens and Indians know that the valley is to be the property of the latter, the 'better it will be for all concerned.
*893 Soliciting your earliest attention to this matter, I remain, very respectfully, your obedient servant,
AustiN Whey,

Superintendent of Indian Affairs, California.

Hon. William P. Dole, Commissioner.
Treaty of peace and friendship between the United States government and the Hoopa, South Fork, Bed-wood, and Grouse Creek Indians.
Article I.
Sec. 1. The United States government, through Austin Wiley, superintendent of Indian affairs for the State for California, by these presents doth agree and obligate itself to set aside for reservation purposes for the sole use and benefit of the tribes of Indians herein named, or such tribes as may hereafter avail themselves of the benefit of this treaty, the whole of Hoopa valley, to be held and used for the sole benefit of the Indians whose names are hereunto affixed as the representatives of their tribes.
Sec. 2. Said reservation shall include a sufficient area of the mountains on each side of the Trinity river as shall be necessary for hunting grounds, gathering berries, seeds, &c.
Sec. 3. The United States government shall provide suitable clothing and blankets for the men, women, and children, which shall he distributed each year by the agent in charge.
Sec. 4. Suitable instructions shall he given the squaws to enable them to make their own clothing, take proper care of their children, and become generally efficient in household duties.
Sec. 5. An agent and a sufficient number of employes to instruct the Indians in farming and harvesting shall be appointed, to reside upon the reservation, and no other white men shall be permitted to reside upon said reservation, except such as are in the military service of the United States or employed in government service.
Sec. 6. A physician shall be appointed to reside upon the reservation, whose duty it shall be to minister to the wants of the sick and look to their health and comfort.
*894 ARTICLE II.
Sec. 1. All Indians included among those subscribing to this treaty must obey all orders emanating from the agent in charge.
Sec. 2. No Indians belonging to either of the tribes herein enumerated shall go beyond the limits of said reservation without a written pass from the agent in charge. All so offending shall not be deemed friendly, and shall be hostile Indians.
Sec. 3. All Indians who have taken part in the war waged against the whites in this district for the past five years shall be forgiven and entitled to the same protection as those who have not been so engaged.
Sec. 4. All guns and pistols shall be delivered to the commanding officer at Fort Gaston, to be held in trust by him for the use and benefit of the Indians, to be used by them in hunting only, in such numbers and for such length of time as the agent may direct. All ammunition in their charge to be turned over to the agents and paid for at its actual value in Indian money.
INDIAN RESERVATION NOTICE.
[There followed the text of the notice of the location of the Hoopa Valley Reservation, which appears in finding 13, supra.]
16. Commissioner W. P. Dole responded to Wiley’s letter (foregoing finding) on October 3, 1864 as follows:
Department of the Interior,

Office Indian Affairs, October 3,186

Sir: Your communication, dated August 29, 1864, enclosing a draught of the agreement made by you with the lately hostile Indians of the Trinity river, with the sketch of the situation of and settlements in the Hoopa valley, and the notice issued by you to the settlers, under date or — , is received and duly considered.
From your description of the valley thus selected for a reservation, its fertility, and consequent capability to sustain the people proposed to be placed upon it, its isolation from the white settlements, and the willingness expressed by the Indians to acquiesce in the arrangements, and confine themselves to the locality selected, *895 I am induced to approve of your action, and trust that great good will result to the Indians, as well as to the whites, by this close of an expensive course of hostilities, and the consequent concentration of the Indians at a point where they can be controlled, and where measures may be adopted to improve their condition. I return herewith a copy of the agreement, as forwarded by you, with certain additions, suggested by the Secretary of the Interior, the document in this amended form meeting with his approval.
The relations of the government of the United States to the Indians of California do not contemplate treaties with those Indians, to be submitted by the President to the 'Senate for confirmation; but as it is deemed 'advisable to have the chiefs and leading men of the tribes in question subscribe their hands to a document which shall fully commit them hereafter, you will, after explaining to them the nature of the additions or alterations now suggested, as being intended solely for their benefit, cause a copy to be signed by them, and forward it to this office. ‡ ‡ ‡ $
The establishment of the Hoopa Valley reservation, if approved, of course contemplates the abandonment of that at Mendocino, as but four are authorized, and it is understood from your communication of later date than the one to which this-is a special reply, that the Indians upon the latter reservation are to be removed this fall to Pound valley.
You will please take special care in the description of the boundaries of the proposed reservation at Hoopa valley, so that its proper limits may be of record in this office and the General Land Office, when approved by the President of the United 'States.
Very respectfully, your obedient servant,
W. P. Hoke, Commissioner.
AUSTIN Wiley, Esq.,
Sup't Indiam, Affairs, 8an Francisco, California.
17. It is conceded that Wiley’s “treaty” (finding 15, supra) was not ratified. (Even agreement is doubtful. No signatures by Indians appear (foregoing finding), and it has not been shown that the Commissioner’s desired amendments (foregoing finding) were ever made known to any Indians or approved by them. In a public notice, however, Wiley said that the treaty stipulations were “confirmed” on February 8, 1865.)
*896 18. From Wiley’s letters, reported in the Commissioner’s report for 1864 (which is the “Indian Keport, 1864” and the source of 'all the page references mentioned below), it appears that
(a) The Klamath Indians were among the Indians at war with the forces of the United States. (“[T]he Klamath and Hoopa or Trinity Indians were at war with the forces of the United States at the time of the passage of the act of 1864, and had been so for some years. Indian Report, 1864, pp. 123, 127, 130, 133, 134-138.” Donnelly v. United States, 228 U.S. 243, 257 (1913).)
In one of Wiley’s letters, he referred to the “Klamath, Kedwood and Trinity Indians, with whom we are now at war.” P. 125; see also pp. 120-21. In other letters he wrote of the war with the Indians of Humboldt, Klamath and Trinity counties (pp. 116, 130). The Indians of Klamath County were surely the Klamath Indians (see findings 3, 5, 6, 14, supra), and it therefore appears that Wiley doubly referred to the Klamath Indians, both 'as “Klamath” Indians and as the Indians of Klamath County.
(b) The warring Indians who had not been taken prisoner had made their headquarters in Hoopa Valley; they were ready to surrender. Pp. 130,131,133,134.
(c) Wiley went to Hoopa Valley, treated with the various tribes be found there, persuaded them to accept his “treaty,” established a reservation and thereby brought to an end the war with the Indians of Humboldt, Klamath and Trinity counties (pp. 116-117, 119), who, as noted above, included the Klamaths.
(d) From the foregoing it follows and is found that despite the caption of the “treaty,” describing it as made with the “Hoopa, South Fork, Kedwood, and Grouse Creek Indians” (finding 15, supra), the tribes with whom it was made included the Klamaths.
(e) A reservation to be shared by Iloopas and Klamaths was not an unfamiliar idea. A treaty concluded in 1851 with bands of Indians of those tribes (but not ratified) would have created such a reservation of a tract which in substan *897 tial part coincided with, what eventually became the Hoopa Valley Reservation.
19. After 1864 the Klamaths lived in peace in and in the area of the Klamath River Reservation, in their villages on the Trinity near the Klamath, on the connecting strip of land between the two reservations, and elsewhere. It follows, therefore, that even if the Klamaths were not originally among the tribes with whom Wiley made his treaty, they availed themselves of its 'benefits within the intendment of its Article I, Section 1 (finding 15, supra), and thereby became entitled to its benefits.
20. With his letter annual report of September 1, 1864 Wiley enclosed a tabular “Report of Indians on the reservation within the California superintendency, September 1, 1864,” containing the name of the reservation, names of tribes, and numbers of Indians, male, female and total. For each of the four reservations other than Hoopa Valley he listed the names of tribes occupying the reservation. For Hoopa Valley, he reported “Various tribes, about 600,” giving no tribal names and no numbers for male and female.
1865 — The 12-Mile Square as the Boundary of the Hoopa Talley Reservation
21. Wiley’s first notice had given no hint of the size of the reservation he had “located”; the notice had said that the reservation, which he called the “Hoopa Valley Reservation,” was “situated on the Trinity River, in Klamath county, California, to be described by such metes and bounds as may hereafter ’be established by order of the Interior Department, subject to the approval of the President” (finding 13, supra).
Wiley’s second public notice, on February 18,1865, read as follows:

To Whom It May Concern:

Be it known that by virtue of power vested in me by Act of Congress passed April 8th, 1864, and acting, under instructions from the Department of the Interior, I have located and set aside for an Indian Reservation the following described tract of land to be known as the Hoopa Reservation: Beginning at a point where Trinity river *898 flows into Hoopa valley and following down said stream, extending six miles on each side thereof, to its junction with Klamath river, as will be more particularly described by 'a map of said Reservation.
Notice is hereby given to all persons not to settle or improve upon said Indian Reservation excepting as the Agent in charge may permit, and in no manner to trespass thereon or interfere therewith.
Free transit through the Reservation will be permitted all travelers, packtrains and stock, subject to such restrictions as the local Agent may see proper to impose.
AUSTIN WlLET,

Suplt Ind. Aff’s, Cal.

Hoopa Reservation, Cal.,
February 18th, 1865.
(No such map as is mentioned in this notice has been referred to by the parties.)
In the first notice (finding 13, supra) Wiley had called the reservation the “Hoopa Valley reservation.” According to a letter he wrote (on August 2,1861) about the time of the first notice (August 21, 1864) he was then thinking of an area about 5x2 miles. The valley is about 6 miles long and the canyon north of it is another 6 miles long. The treaty contemplated a reservation of the “whole of Hoopa valley.” When, therefore, the public notice in 1865 described a reservation whose north-south dimension was the river from the beginning of the valley on the south to the junction with the Trinity on the north, the reservation was being doubled in size, in that dimension alone. And, significantly, the added area in the north — the canyon of the Trinity near the junction with the Klamath — was native territory of the Yuroks.
The Trinity River in the Hoopa Valley, described by Wiley in the foregoing notice as bisecting the reservation he located, flows north through the valley to the junction of the Trinity and the Klamath. The valley of the reservation was for a time thought of as 16 miles long, but was finally regarded as 12 miles in extent. Since the reservation was described as extending 6 miles on each side of the river, to the junction of the two rivers, the reservation formed a 12-mile square bisected by the last 12 miles of the Trinity River, and was to be called the “Square” or the “12-mile Square.”
*899 The Square was centered on the trunk of the Y formed by the two rivers (finding 2, supra). Compared to the Square, the Klamath River Reservation was in terms of the Y a thickening of the upper half of the Y’s left arm (finding 2, supra). Actually, the boundaries of the Klamath River Reservation zigzagged, following the river’s turnings. Between the two reservations was non-reservation land and a stretch of the Klamath River about 25 miles long.
1864--1875 — The Peoples of the Hoopa Talley Reservation
22. As of February 18, 1865, when Superintendent Wiley defined the boundaries of the Hoopa Valley Reservation (foregoing finding), there have been identified, among the “various tribes” resident there (finding 20, supra), a substantial number of the Hoopa tribe living in several villages in the Hoopa Valley proper, a smaller group of Lower Klamath or Yurok Indians living in a few villages in the northern and northwestern part of the tract and a number of Indians of the Redwood or Chilula tribe. (See findings 5, 20, supra.)
23. The native villages of the Hoopas were along the Trinity River in the Hoopa Valley, within the Square, and continuing upstream (south) to, at least, the Trinity’s south fork, beyond and south of the Square.
24. The native villages of the Redwoods or Chilulas were elsewhere than on the Klamath or Trinity Rivers.
25. In 1865, Charles Maltby, the Superintendent of Lidian Affairs, California, reported that it was expected that some 1,800 Klamath River Indians would move to the Hoopa Valley Reservation. The move did not take place.
26. Superintendent Maltby’s report for 1865 states that the Hoopa Valley Reservation could support only the Indians living there at that time .and “those that will probably come in from the vicinity.”
27. A report of B. C. Whiting, Superintendent of Indian Affairs, California, to the Commissioner in 1868 stated that he was preparing a large number of Indian houses at Hoopa Valley for the Smith River Lidians and such others as he could collect together.
28. (a) In 1869 more than 300 Indians were moved by the *900 Superintendent to Hoopa Valley in the Hoopa Valley Reservation from the Smith River Reservation, terminated by statute. These Indians were of the S'aiaz or Nongatl, the Wiyot, Wylackie and Sinkyone tribes. The native villages of these tribes were elsewhere than on the Klamath or Trinity Rivers.
(b) The report for 1872 by the Commissioner of Indian Affairs is revealing for its identification of the reservation with Indians generally in Northern California and its recognition of the varied tribes then on the reservation.
The report said:
Hoopa Vall&y agency. — The Indians belonging to this agency are the Humboldts, Hoonsoltons, Miscolts, Siahs, and several other bands, numbering 725.
A reservation was set apart per act of April 8, 1864, for these and such other Indians in the northern part of the State as might be induced to settle thereon. This reservation is situated in the northwestern part of the State, on both sides of the Trinity River, and contains 38,400 acres. * * *

Formal Location of the Reservation by Executive Order in 1876

29. Wiley’s location of the reservation in 1865 was soon implemented by legislation for payment for the improvements made by settlers, but his action did not get Presidential confirmation for 11 years, until 1876.
By Executive Order of June 23, 1876, President Grant formally defined the boundaries of the Hoopa Valley Reservation as follows:
It is hereby ordered that the south and west boundaries and that portion of the north boundary west of Trinity River surveyed in 1875 by C. T. Bissel, and the courses and distances of the east boundary, and that portion of the north boundary east of Trinity River reported but not surveyed by him, viz: “Beginning at the southeast corner of the reservation at a post set in mound of rocks, marked “H.V.R. No. 3”; thence south 17% ° west, 905.15 chains, to southeast corner of the reservation; thence south 72%° west, 480 chains, to the mouth of Trinity River,” be, and hereby are, declared to be the exterior boundaries of Hoopa Valley Indian Reservation, and the *901 land embraced therein, an area of 89,572.43 acres, be, and hereby is, withdrawn from public sale, and set apart for Indian purposes, as one of the Indian reservations authorized to be set apart, in California, by act of Congress approved April 8,1864. (13 Stats, p. 39.)
The metes and bounds description of the reservation in this executive order encompassed substantially the same tract of land defined by Superintendent Wiley’s more general description of February 18, 1865 (finding 21, supra), namely, an approximately 12-mile square tract bisected by a stretch of the Trinity Fiver beginning at its junction with the Trinity Fiver and continuing upstream for 12 miles for the extent of the Hoopa Valley.
Though the Commissioner in his letter of October 3,1864 had cautioned Wiley to take special care in fixing the boundaries of the reservation “so that its proper limits may be of record in this office and the General Land Office, when approved by the President of the United States,” the President’s order is the first precise description of the reservation.
1876-1891 — The Peoples of the Hoopa Valley Reservation
30. In 1875 and 1876, at about the time of the executive order formally defining the boundaries of the Hoopa Valley Feservation (preceding finding), there have been identified as living within the Hoopa Valley Feservation Indians the following tribes:
Tribe 1875 1876
Hoopas.... 571 511
Klamaths. 43 44
Redwoods. 46 12
Saiaz.. 66 13
31. From 1877 to 1891 there appeared in the annual reports of the Commissioner of Indian Affairs a schedule of all reservations listing, for each reservation among other things, “tribes occupying or belonging to the reservation.” For the Hoopa Valley Feservation the tribes named were Hunsatang, Hoopa, Klamath Fiver, Fedwood, Saiaz, Sermalton, Miskut *902 and Tishtanatan. The Hunsatang, Sermalton, Miskut and Tishtanatan were regarded as “bands” of Hoopas, closely related to them.
32. In 1886 the Indians living on the Iloopa Valley Reservation included Hoopa, Yurok, Karok and Redwood Indians, according to the first census of the reservation, described below in finding 37.

The Enlargement of the Hoopa Valley Reservation by Executive Order in 1891

33. On October 16, 1891, by executive order, President Harrison extended the “Hoopa Valley Reservation” to include a tract “one mile in width on each side of the Klamath River” from the then northern boundary of the “Hoopa Valley reservation” to the Pacific Ocean:
Executive MANSION, October 16, 1891.
It is hereby ordered that the limits of the Hoopa Valley Reservation in the state of California, a reservation duly set apart for Indian purposes, as one of the Indian reservations authorized to be set apart, in said State, by Act of Congress approved April 8,1864, (13 Stats., 39), be and the same are hereby extended so as to include a tract of country one mile in width on each side of the Klamath River, and extending from the present limits of the said Hoopa Valley reservation to the Pacific Ocean; Provided, however, That any tract or tracts included within the above described boundaries to which valid rights have attached under the laws of the United States are hereby excluded from the reservation as hereby extended.
Benj. HaReisoN.
34. President Harrison’s order added to the Square the Klamath River Reservation, at the upper end of the Y’s left arm (finding 22, supra), and the strip of land between the two reservations. The newly-added lands are herein called the “Addition.”
The enlarged reservation consisted of the Addition, a tract 45 miles long x 2 miles wide, extending the length of the Y’s entire left arm, joined to the 12-mile 'Square. The shape *903 of the Addition and the Square combined was something like a square skillet with an extraordinarily long, thin handle.
In the enlarged reservation, the former Klamath River Reservation is herein called the “Lower Klamath Strip,” and the intermediate strip of land is called the “Connecting Strip.”
The entire reservation as enlarged contained 147,740 acres, 25,000 in the Lower Klamath Strip, 33,168 acres in the Connecting Strip, and 89,572 acres in the Square.

Access of Addition and Square Indians to the Enlarged Reservation

35. After 1891 Indians living on the Addition freely fished and hunted and gathered basket materials on the Square, and Indians of the Square freely fished and gathered basket materials on the Addition. There is no evidence that this was n'ot the case prior to 1891.
36. After 1891, Indians of the Addition attended the boarding school maintained by the Government at the Indian Agency at Hoopa, on the Square, and came for medical treatment to the Government hospital there. There is no evidence that this was not the case before 1891, and there is some evidence that Indians from elsewhere than the reservation also came to the hospital for medical treatment.

Censuses on the Hoopa VaUey Reservation

37. The first census roll listing the individual Indians of the original Hoopa Valley Reservation was compiled in 1886 under the supervision of Superintendent Dougherty. It was prompted by the Act of July 4, 1884, 23 Stat. 98, which instituted a practice of the annual taking of a census of Indians upon reservations.
This first census roll was entitled “Census of the Different Ranches of the Hoopa Valley Indians.” It (and all censuses until 1930) did not show the tribe of the listed Indian. However, the Indians listed included, in fact, members of the Yurok, Karok and Redwood tribes, 'as well as Hoopas.
38. The 1887 census on the Hoopa Valley Reservation was designated the “Census of the Hoopa Valley Tribe of In *904 dians.” In 1888 and 1889, the census was headed “Census of the Indians of the Hoopa Tribe.” In 1890 it was on some pages headed “Census of Hoopa Valley Reservation Indians’1 and on others “Census of the Hoopa Indians.”
The Indians listed in these censuses included members of the Hoopa, Klamath River (Yurok and Karok) and Redwood tribes.
39. In 1892, the first year after the enlargement of the Hoopa Valley Reservation, and again in 1894, the reservation census was recorded in two parts. One part, variously called a census of the “Hoopa Indians of the Hoopa Valley Agency” and a census of the “Hoopa Valley Indians,” listed the Indians on the Square, including the non-Hoopas resident there. The other part, called a census of the Klamath Indians of the Hoopa Valley Agency, listed the Indians on the Addition.
40. In 1893, and again in 1895, 1896, 1897, and 1899 (no census was taken in 1898; two were taken in 1899) only a census of the Indians on the Square was taken. In 1893 and 1899 it was called a census of the “Hoopa Indians,” in the other years, a census of the “Hoopa Valley Indians.” As before, it included the non-Hoopas on the Square.
41. The 1900 census of the Hoopa Valley Reservation intermingled in one list the Indians on the Square and on the Addition and was designated the “Census Roll of the Hoopa and Lower Klamath River Indians.” These Indian names were as before not meant to be tribal but rather geographical; Karoks and Redwoods were included.
42. From 1901 through 1907, a census was taken only of the Indians on the Square. In these years the census was referred to as a “Census of the Hoopa Indians.” As before, it listed Yuroks, Karoks and Redwoods in addition to Hoopas.
43. Beginning in 19,10 and continuing each year through 1933, the census was recorded in three parts. One part was entitled “Census of the Hoopa Indians,” another was the “Census of the Klamath River Indians of the Connecting Strip” and the third, “Census of the Lower Klamath River Indians.” While most of those listed on the third part, *905 “Census of the Lower Klamath River Indians,” were of the Lower Klamath or Yurok tribe, the designation “Lower Klamath River Indians” did not refer to the Lower Klamath River or Yurok tribe as distinguished from the Upper Kla-math River or Karok tribe, but rather meant the Indians on the Lower Klamath Strip. Most of those on the list entitled “Census of the Klamath River Indians of the Connecting Strip” were Lower Klamath or Yurok Indians.
As before, the list entitled “Census of Hoopa Indians” listed the names of the Indians on the Square regardless of whether they were of the Hoopa, Yurok, Karok, Redwood or other blood.
44. Superintendent Keeley of the Hoopa Indian Agency wrote to the Commissioner on October 24, 1929 that it was meaningless to divide the Indians supervised by the Agency into Hoopas, Klamath River Indians, Lower Klamath Indians and the other tribes of whom census rolls were prepared annually:
So far as these names are concerned and these divisions, they now mean nothing to us. At one time they possibly meant a division of the Indians so far as residence was concerned, but they have moved about so much and intermarried, and they have apparently been transferred at different times from one census to another until such division is absolutely worthless and confusing.
They have lost tribal affiliation to such an extent that very few of them know what tribe they belong to, and if they name a tribe, it is, in fact not a tribe but a band of Indians named after some local name of a place where they once resided. This division has resulted in many duplications, we found when the enrollment of California Indians was made by Mr. John H. Anderson.
I am now asking authority to revise this census and make up a new one, corrected in accordance with the affidavits furnished Mr. Anderson as to families, same to be a strictly alphabetical roll of the Indians under the jurisdiction of the Hoopa Valley Agency without the divisions noted above.
45. The census forms were revised for the year 1930 to include a space for designating the tribe of the individual to be listed, but the tripartite division was retained. The pro *906 vision of a space for the tribe of the person listed did not appreciably improve the accuracy of the census as an indicator of tribal affiliation. Those listed on the part of the census entitled “Census of the Hoopa Indians” were nearly always designated as a member of the Hoopa tribe even though they were actually Lower Klamath (Yurok), Upper Klamath (Karok), Redwood Indians or of the blood of more than one tribe. The individuals on the part entitled “Census of the Klamath River Indians” were designated as members of the Klamath River tribe and those on the census part entitled “Census of the Lower Klamath River Indians” were designated as members of the Lower Klamath tribe.
46. Some censuses listed off-reservation people, with off-reservation addresses. From about 1930, inclusion in the census was based not on residence but upon a concept of enrollment on the reservation equivalent to entitlement to be regarded as a reservation Indian (see findings 199, 207, 211, infra).
47. On January 12, 1933 Special Agent Roblin reported that the census rolls of Klamath River and Lower Klamath River Indians were inextricably mixed. Intermarriage and Changes of residence had resulted in changes of names from one roll to another. Some of the confusion came, he said, from the use of the words Lower Klamath, the name of the strip constituting the former Klamath River Reservation; the Indians themselves referred to all Indians living below a village near the junction of the Klamath and Trinity as “lower Klam'aths,” which would leave all of the original Klamath River Reservation and the Connecting Strip in “Lower Klamath” country. The text of the relevant “Note” to his letter is set out in finding 94, infra, in another connection.
48. The tripartite division of the roll was ended in 1933. From that year until the last complete reservation roll was compiled in 1940, the Hoopa Valley Reservation roll was in a single part. The Indians designated as of the Hoopa tribe and as of the Klamath River tribe were intermingled, the designation Lower Klamath was dropped entirely. The roll continued to designate nearly every Indian residing on the *907 Square as of the Hoopa tribe whether or not he actually was of Hoopa blood. In a few instances, mixed-blooded Indians were designated as Hoopa-Klamaths. On the 1940 roll, the designation Yurok was substituted for Klamath River. No roll was compiled in 1941. In the years 1934,1935, 1938, 1939 and 1942 only supplementary rolls were compiled. No rolls were compiled thereafter.

Background of the 1891 Executive Order and the Act of June 17, 1892

49. (a) For about 20 years prior to the 1891 executive order there had been repeated recommendations by various officers that a reservation be established along the Klamath River for the 'Indians living there or that the Hoopa Yalley Reservation be enlarged to encompass parts or all of the land bordering on the Klamath to the Ocean. Some of these recommendations are described in the following subpara-graphs.
(b) A report of Special Commissioner John V. Farwell to the Commissioner in 1871 urged that the efforts of the Government to civilize the Indians would be facilitated by the extension of the Hoopa Yalley Reservation to the mouth of the IQamath River so as to include the Klamath Indians.
(c) The report of Superintendent of Indian Affairs, California, B. C. Whiting, for 1871 states: “I would therefore respectfully recommend that the Hoopa Reservation be so extended as to take the [Klamath] river and the land for 3 miles back upon both sides to the Pacific Ocean, and thereby include the Klamaths, without requiring any to remove, other than those who may prefer to live at Hoopa.”
(d) A report of September 1, 1871 from D. H. Lowry, Indian Agent, Hoopa Valley Reservation, states his belief that the some 2,500 Indians along the Klamath are well disposed towards the whites, deserving of assistance and come to the reservation for help in respect of crops, farming implements and otherwise, which he is unable to provide as he would like to, and which he recommends be provided. “I would also recommend that all the lands lying along the Klamath River, from a point 2 miles above the mouth of *908 the Trinity Eiver, extending back to the summits of the mountains on either side, be annexed to the Hoopa reservation, and be declared a part of the same.”
(e) The report of the Commissioner of Indian Affairs to the Secretary for 1812 states the recommendation of the Superintendent of Indian Affairs, California, that the Hoopa Valley Eeservation be extended to include the Klamath Indians who lived adjacent to the reservation along the banks of the Klamath and formerly belonged to the abandoned Klamath Eiver Eeservation.
(f) In 1885 Special Agent Paris H. Folsom conducted an investigation of apprehended troubles between whites and the approximately 200 Klamath Indians in 14 villages on the banks of the Klamath Eiver between the Klamath Eiver Eeservation and the Hoopa Valley Eeservation. He recommended that a 2-mile wide tract of land centering on the river between the two reservations be set aside for the sole use and possession of those Indians, and that the lands then be given in trust to the Indians. The Commissioner attached this report to his report to the Secretary for 1885, saying that he would make suitable recommendations for protection of the Indians in respect of their lands.
50. At the same time as these recommendations that a reservation be created along the Klamath, a movement was going on in Congress to open the lands of the Klamath Eiver Eeservation, as an abandoned reservation, to public entry and sale. The bills in Congress for this purpose, introduced from 1879 on, were steadily opposed by the Department of the Interior, which! maintained that the Klamath Eiver Eeservation was not abandoned, was still in a state of reservation and that the homes of its Indians needed protection. The Department conditioned its willingness to agree to public sale on the bills being amended to protect the Indians by providing for the allotment of land to them in severalty, before public sale of the remaining lands.
51. The first bill for the public entry and sale of the Kla-math Eiver Eeservation, in 1879, provided that the Klamath Eiver Eeservation “is hereby abolished” and directed the ■Secretary of the Interior to have the lands surveyed and *909 opened to homestead, pre-emption entry and sale, “the same as other lands.” S. Ees. 34, 46th Cong., 1st Sess. (1879); 9 Cong. Eec. 1651 (1879).
52. No action having been taken on this bill, another, with the same provisions, was next introduced in 1880. 10 Cong. Eec. 286 (1880); H.E. 3454, 46th Cong., 2d Sess. (1880). The House committee report on this bill declared that the establishment of the reservation in 1855 had been a mistake and an injustice, because it blocked access of the adjoining lands to the river; that the reservation had been abandoned after the flood of 1861, and that the Indians had been removed to Smith Eiver and then to the Hoopa Valley Beser-vation “where they were permanently located.” The report set out a letter from the Office of Indian Affairs in 1874, signed by Commissioner Shuter, stating that the flood in 1861 had rendered the reservation worthless and that the reservation “has not been used for any public purposes since the freshet referred to and the department has no claim upon it.” H.E. Eep. No. 1354, supra, 2.
The report continued that white settlers had in reliance on this letter improved their homes and buildings but that nevertheless -at the instance of the Department of the Interior in 1877 the "War Department forced the settlers to leave the reservation; that the Indians now there did not belong there but belonged on the Hoopa Valley Beservation; that the area was extremely fertile and timbered and suitable for wine and fruit and timber-cutting, none of Which could be developed because the reservation blocked access to the natural highway, the navigable Klamath Eiver.
The report concluded (H.R. Rep. No. 1354, supra, 5):
It is the opinion of the committee, after careful investigation, that the government can have no use for these lands as an Indian reservation. The Hoopah Eeser-vation, to which the Indians were removed and settled upon after the freshet in 1862, is located but 15 miles from the abandoned Klamath Eeservation, and is capable of sustaining many thousands more of Indians than are now located upon it. Why, then, should these lands in question be kept from settlement and improvement by white citizens who are eager to expend their labor and means in the development of their resources?
*910 If there be no use for this abandoned reserve for the purposes originally intended, the committee can see no valid reason why it should not be restored to the public domain, and again made free for the access of labor and capital of white settlers seeking homes and fields for their energy and enterprise. Entertaining this view, after an impartial and careful consideration of all the evidence submitted, they are constrained to report in favor of the measure, and they therefore return the bill to the House, with the recommendation that it pass.
The report did not mention (as appeared in a report in the next session) that the Indian Office opposed the bill. H.R. Rep. No. 1148, 47th Cong., 1st Sess. 1 (1882).
The bill as reported was recommitted and no further action was taken on it. 10 Cong. Rec. 3126 (1880).
53. An identical bill was introduced in the following Congress (H.R. 60,47th Cong., 1st Sess. (1881)) and upon reference to the Office of Indian Affairs was there approved with an amendment providing for allotments to the Indians. 13 Cong. Rec. 90, 3414 (1882). Commissioner Hiram Price’s letter of comment on the bill, dated March 24, 1882, stated (H.R. Rep. No. 1148,47th Cong., 1st Sess. 2 (1882)):
To return to the consideration of the bill: The lands embraced within the said reservation are not needed (as a reservation) for Indian purposes, but that the Indians residing thereon should be protected in the peaceful occupancy and enjoyment of their homes, to which they have become much attached, and where they have gained a livelihood unaided by the government for more than a quarter of a century, is certainly beyond dispute.
In order to effect this, I have to recommend that a further provision be added to the bill, at the end thereof, in substance as follows :
“That before any of the foregoing provisions except that authorizing and directing the Secretary of the Interior to have the lands embraced in said reservation surveyed, shall be held and deemed to be in effect, there shall be selected and allotted to each Indian belonging to and residing upon said reservation, lands within the limits of said reservation as follows: '
“To each head of family one quarter-section.
“To each single person over eighteen years of age, one-eighth of a section.
*911 “To each person under eighteen years of age, one-sixteenth of a section.”
*****
With, the amendment above proposed, I see no objection to the passage of the bill. * * *
The committee report also contained a letter dated September 26, 1881 from Lt. Gordon Winslow of the Army, the Acting Indian Agent. Lt. Winslow stated that a census of the Indians just taken under military auspices reflected the presence of 213 Indians on the Klamath River Reservation. The census, he said, was “as nearly accurate as it can well be”; his earlier report, in the same year, of 115 Indians was, he said, based on information from civilians “who are, I believe, somewhat inclined to lessen the number, thinking doubtlessly that the smaller the number the greater the likelihood of its being thrown open to settlers.”
The committee approved the bill with the amendment suggested by the Commissioner. No action, however, was taken hy the House.
54. The next three bills, in 1883 and 1884, in the 48th Congress, acceded to the desires of the Interior Department. The bills assumed that the Klamath River Reservation was in existence and provided that allotments to the Indians should be made before the land was to be opened to white settlement as public land. H.R. 112, 48th Cong., 1st Sess. (1883); H.R. 7505, 48th Cong., 1st Sess. (1884), reported by the Committee on Indian Affairs as a substitute for H.R. 112; S. 813, 48th Cong., 1st Sess. (1883) . These bills “abolished” the Klamath River Reservation and directed that the lands embraced therein be surveyed and “made subject to homestead and pre-emption entry and sale the same as other public lands,” with, however, a proviso that before this was done there should be allotted land in stated amounts to the Indians belonging to and residing within the reservation.
55. Perhaps encouraged by the prospects of these bills, the Indian Bureau in 1883 began the work of allotment of Kla-math River Reservation land, and selections were made by the Indians under the supervision of the Agent at Hoopa *912 Valley. (The allotments Ml through, however, when the surveys were found to be erroneous and fraudulent.)
56. None of the three mentioned bills (finding 54, supra) was enacted. The report of the Commissioner of Indian Affairs for 1885 says that it is “presumed that they were not reached in the regular course of business before adjournment.” The Commissioner added that:
It is my intention to ask at an early day for legislation suitable to the wants of these Indians. They do not need all the lands at present reserved for their use, but they should be permanently settled, either individually or in small communities, and their lands secured to them by patent before any portion of their reservation is restored to the public domain.
57. On December 21,1885 identical bills were introduced in the House, repeating the provisions of the three bills introduced in 1883 and 1884 (finding 54, supra). H. R. 158 and 165, 49th Cong., 1st Sess. (1885); 17 Cong. Rec. 370 (1885). No action was taken.
58. The years 1886 through 1889 saw no further bills for the sale of the Klamath Eiver Eeservation. Other significant developments, however, occurred. Congress in 1887 passed an act providing generally for allotments of reservation land to Indians in severalty and the federal courts in 1888 ruled that the Klamath Eiver Eeservation did not have the legal status of an Indian reservation. Both developments are discussed in the immediately following findings.
59. The General Allotment Act of February 8, 1887 (24 Stat. 388) authorized the President to survey the lands of any Indian reservation created by treaty, statute or executive order and “to allot the lands in said reservation in severalty to any Indian located thereon.” As soon amended by the Act of February 23,1891 (26 Stat. 794) each Indian was to receive % of a section (or 80 acres), the acreage to be doubled in size where the land was valuable only for grazing.
60. A case now arose of a commercial fisherman named Hume who employed Indians to fish in the Klamath Eiver within the boundaries of the Klamath Eiver Eeservation, and paid them with goods. The Department of Interior, desirous of protecting the reservation from such intrusions, caused the *913 prosecution of a libel against Ms goods, for unlicensed trading in an “Indian reservation” or in “Indian country” in violation of R.S. § 2133, as amended July '31,1882 (22 Stat. 179).
61. The Government’s position was set out in detail in a letter of April 4, 1888 from Commissioner J. D. C. Atkins, which the United States Attorney presented to the district court on the hearing of the case. On a review of the history of the reservation, the Commissioner concluded that the Klam-ath River Reservation was regarded by the Department “as in a state of Indian reservation,” under the supervision of the Hoopa Valley Indian Agency.
Commissioner Atkins quoted from a letter from Superintendent Wiley of January 19, 1865, in connection with the location of the reservation at Hoopa Valley, that it was his “present purpose” to locate the Indians then at Smith River “upon the land formerly occupied as an Indian reservation upon the Klamath River, and which was abandoned in 1861, but is still reserved by the Government. The Hoopa Reservation will either be extended so as to cover tMs point, or it will be kept up as a station attached to that reservation and under the control of the same agent.” Commissioner Atkins said that this letter showed that the plan of the Superintendent was to “annex the Old Klamath River Reservation (with which we are now especially concerned), to the new Hoopa Valley Reservation.” “I find,” he concluded, “that this office warmly commended and approved the superintendent’s course.”
The Commissioner also.quoted from letters from former Commissioners to the Secretary of August 14, 1877 and March 8,1878, stating that when the Agency at the Klamath River Reservation moved to the Smith River Indian Reserve and the Indians (with the exception of one band) refused to leave (finding 8, supra), “it was not deemed advisable to recommend its [the reservation’s] restoration to the public domain,” and that “In view of these facts the reservation should, in my opinion, be preserved intact until some measures are devised for the permanent settlement of these Indians.”
62. The district court on June 7, 1888, nevertheless dis *914 missed the libel, with an opinion holding that the Klamath River Reservation did not have the legal status of an Indian reservation, although, the court also held, the reservation was not open to public entry as public lands. The act of 1864 (finding 10, supra), the court held, had authorized the creation of four reservations; lands of old reservations not set apart within the four new reservations were under section 3 of the act not subject to the operation of the general land laws but reverted to the control of the Secretary of the Interior, for survey and sale at auction. The President, the court continued, had in various orders and modifications of orders exhausted his authority under the act by the creation of four reservations — the Tule River Reservation, the Hoopa Valley Reservation (as to which, the court said, a suggestion that it include the Klamath River Reservation was not adopted), the Round Valley Reservation and Reserves for Mission Indians — and the Klamath River Reservation not having been included in any of the four reservations, the lands of that reservation were under section 3 of the act relinquished “for the purposes of Indian reservations,” and came into the possession of the United States for the survey and sale provided for by that section. United States v. Forty-Eight Pounds of Rising Star Tea etc., 35 Fed. 403 (D.C.N.D. Calif. 1888).
63. The Secretary of the Interior requested that the Attorney General appeal the foregoing decision of the district court. In the Secretary’s annual report for 1888 he said that in order to protect the Indians, authority ought at once be given, during the pendency of the appeal “to set apart these lands as a reservation and thus remove all doubt.”
64. On January 14,1889, while the Hume case was pending on appeal, another bill was introduced in the House to open the Klamath River Reservation to public sale. H.R. 12104, 50th Cong., 2d Sess. (1889); 20 Cong. Rec. 756 (1889). Perhaps in response to the district court’s ruling that the reservation had lost its status as an Indian reservation but had not become public land, rather having come into the possession of the United States, under the act of 1864, for the purposes of survey and sale, the bill provided that the reservation *915 should be regarded for the purposes of the act as in a state of reservation within the meaning of the General Allotment Act of 1887 (finding 59, supra), and lands should be allotted to the Indians pursuant to that act, before public sale took place. Further, that surplus lands after allotment, despite the contrary provisions of the General Allotment Act, would be deemed to be and held as public lands subject to the laws for the disposition of public lands.
No action was taken on the bill.
65. (a) Shortly thereafter, and while the Hume case was still pending on appeal, the Senate by resolution of February 13, 1889 (20 Cong. Nee. 1818 (1889)) directed that the Secretary of the Interior inform it as to what proceedings had been taken for the survey and sale of the Klamath Indian Neservation, presumably the survey and sale which the district court had held was now the province of the Secretary. The Secretary’s response, in the form of letters from the Commissioners of Indian Affairs and the Land Office, was that no such proceedings had been taken, because the lands had been in a state of reservation continuously since 1864.
(b) The letter from Commissioner of Indian Affairs John II. Oberly, dated February 18,1889, stated:
In response to said resolution, I have to state that I am unable to discover from the records or correspondence of this office that any proceedings were ever had or contemplated by this Department for the survey and sale of said reservation under the provisions of the act aforesaid: on the contrary, it appears to have been the declared purpose and intention of the superintendent of Indian affairs for California, who was charged with the selection of the four reservations to be retained under said act, either to extend the Hoopa Valley Neservation (one of the reservations selected under the act), so as to include the Klamath Niver Neservation, or else keep it as a separate independent reservation, with a station or subagency there, to be under control of the agent at the Hoopa Valley Neservation, and the lands have been held in a state of reservation from that day to this.
(c) The letter from the Commissioner of the Land Office, dated February 28,1889, advised that surveys of the Klamath Niver Neservation were made in 1882; that in a letter of *916 April 4,1883 to the Secretary, the Commissioner of Indian Affairs “recommended that allotments be made to the lila-math River Indians based upon the public surveys herein stated, and that the rest of the reservation be restored to the public domain”; that attempts were made in 1884 by the Indian Office to make allotments using the surveys made but that on examination the surveys were found to be irregular and fraudulent and the allotments made were recommended for cancellation by the Indian Commissioner; and, finally, that resurveys had been made and were still under examination.
66. On April 1,1889, the circuit court affirmed the decision of the district court in the Hume case, under the same title, in 38 Fed. 400 (C.C.N.D. Calif. 1889). The opinion of the circuit court was essentially the same as that of the district court (38 Fed. 400-1) :
The president did thereafter [after the act of 1864] act from time to time, and he did set off four tracts in different parts of the state for the purposes provided for, and he did not include in any one of them the “Klamath Indian Reservation,” theretofore set apart. In setting apart these four reservations without including the Klamath reservation, he necessarily exercised 'his discretion, and, 'by implication at least, excluded them. As they were not retained by the future and further action of the president “for the purposes of Indian reservations,” “under the provisions of the preceding sections of this act,” the reservation, by the terms of the act itself, abolished or abrogated the prior reservation. This necessarily follows from the provision requiring these lands not embraced in the reservations made 'by the action of the president under that act to be cut up into lots of suitable size and sold, as provided in the act.
67. In December 1889 and January 1890 identical bills introduced in the House and Senate provided, simply and without mention of allotments, that “all of the lands in what was the Klamath River Reservation” are “declared to be subject to settlement, entry, and purchase” under the land laws. H.R. 113, 51st Cong., 1st Sess. (1889); 21 Cong. Rec. 229 (1889); S. 2297, 51st Cong., 1st Sess. (1890); 21 Cong. Rec. 855 (1890).
*917 The bills were opposed in a report by the Indian Office dated October 15, 1890 (described some months later in a letter of January 7,1891 from Commissioner Morgan to the Secretary), recommending that the bill be amended to provide for allotments to the Indians under the General Allotment Act, the surplus unallotted lands to be restored to the public domain and the funds from the disposal of the lands to be put to the credit of the Klamath River Indians. With such a provision for allotments, the Indian Office said, it would not object to the sale of the surplus lands. Without it, the Office would “strenuously oppose” sale of the land:
In no event should the bill under consideration, or any other like measure be adopted unless provision is made for the allotment of lands in severalty to the Indians and some means provided to enable them to get a start in agricultural pursuits, and for the education of their children. With such protection and assistance secured to them, this office would interpose no objection to the disposal of the surplus unallotted lands as provided in the bill under consideration. But it would feel 'bound to strenuously oppose any measure looking to the opening of the lands of said reservation to settlement or sale that did not secure to the Indians permanent title to their homes, which can best be done by allotting lands in severalty to them as hereinbefore recommended.
68. Amendment of the bill as urged by the Indian Office was emphatically rejected by the House Committee on Indian Affairs. On April 1, 1890 the Committee reported H.R. 113, still providing for public sale, but with an amendment affirmatively rejecting any allotments on the Klamath River Reservation. The amendment provided that the Indians on the Klamath River Reservation be removed to the Hoopa Valley Reservation and there allotted, and that the proceeds from the sale of the lands be a fund to be used by the Secretary of the Interior for the “removal, maintenance, and education” of the Indians residing on the lands and their children. (Emphasis added; H.R. Rep. No. 1176, 51st Cong., 1st Sess. 2 (1890).)' In this form the bill passed in the House, in 'September, 1890 (21 Cong. Rec. 10702 (1890)) and in the Senate was referred to committee (21 *918 Cong. Rec. 10740 (1890)). The Senate took no action, either on the bill as first introduced or as it passed in the House.
69. The passage of a bill so flatly rejecting allotment and providing for public sale spurred the Department of the Interior to action. On December 23, 1890 the Secretary suggested to the Commissioner of Indian Affairs that he “consider the question whether a reservation should not be made for the Klamath River Indians, * * * and if so, you will please prepare the proper description and orders for the purpose.”
70. Commissioner Morgan responded promptly, on January 7, 1891, and at length. Reviewing the establishment of reservations in California under the act of 1864 (finding 10, supra), he raised a question as to whether four reservations were in fact established under that act. The Smith River Reservation, he said, was intended to be only temporary and the Tule River Reservation was simply leased and not set apart under the act. His implication was that, contrary to the premise of the decision in the Hume case (findings 62, 66, supra), the President had not exhausted his authority under the act of 1864 to create four reservations in California.
He also discussed the proposed legislation to sell publicly the lands of the Klamath River Reservation, and the opposition of the Department of the Interior unless the bill were amended to provide first for allotments of land thereon to the Indians in severalty, and urged further efforts to cause the enactment of the legislation favored by the Department, i.e., for allotment of lands to the Indians resident there and sale of the surplus lands, with the proceeds to be used for the benefit of the Indians. As to non-reservation Klamath Indians, resident between the IToopa Valley Reservation and the Klamath River Reservation, he noted and restated Agent Folsom’s recommendation (finding 49(f), supra) that the connecting strip of land between the two reservations be set aside for Indian use.
He concluded by saying that he would prepare whatever papers were requested, but that he was not prepared to recommend the establishment of a new reservation unless the Klamath’s reservation was endangered, in which case the *919 Hoopa Valley Reservation should 'be extended along the Klamath to the ocean:
* * * If it shall be found that by the decisions of the courts or through the failure of Congress to act, the Klamaths are likely to loose [sic] the reservation established in 1855, it may become expedient to extend the Hoopa Valley reservation so as to include lands on both sides of the Klamath River, two miles in width on each side, from that reservation to the mouth of the river.
71. The Secretary thereupon sought the opinion of Assistant Attorney General George H. Shields, assigned to the Department of the Interior. Mr. Shields’ opinion, dated January 20, 1891, responded as well to inquiries put to him earlier. He considered three questions: (1) “whether the Department is authorized to cause the removal of intruders from said [Klamath River] reservation”; (2) “whether the lands within the limits of said reservation can be allotted to the Indians living upon them, as reservation Indians, or under the legislation providing for allotments to non-reservation Indians”; and (3) the Secretary’s immediate question, “whether the Hoopa Valley Reservation may not £be legally extended so as to cover the ground of the Klamath Reservation.’ ”
The opinion described the creation of the various reservations under the act of 1864, particularly pointing out that reservations had been created of noncontiguous parcels and by orders and successive orders revoking and amending earlier orders and setting aside substituted lands as reservations, and continued:
Three conclusions inevitably flow * * *: 1, that no formal order of the President retaining an existing reservation was deemed necessary, but its [the Tule River Reservation] actual retention by the officers of the Indian Bureau was sufficient to constitute it one of the four authorized reservations; 2, that contiguity was not an essential, but a reservation might be composed of several noncontiguous parcels of land; and, 3, that the Executive authority, in that respect, was not exhausted when once exercised in the setting apart of “four tracts” or parcels of land, as reservations; but that discretion *920 continued, and yet exists, to change, add to, diminish or abolish reservations and establish others, as may seem most promotive of the public interests.
In relation to the Klamath River reservation, as in that of the Round Valley, no formal or written order appears to have been issued for its retention. In both of these 'instances the Indian office retained possession and control of the former reservations, making no change in their condition, status or management, further than that they passed under control of the one State Superintendent as required by the act of 1864. The Indians remained in the occupation of both of these reservations, and yet so occupy them alone, except so far as that occupation may have been intruded upon by individual white men, under color of claims. Congress has made annual appropriations for support of the Indians on the Round Valley reservation, but none for those on Klamath, and for the all sufficient reason that the latter are self-supporting and have never cost the government a dollar in this respect.
Mr. Shields then turned to a detailed statement of the “special circumstances” showing, he believed, that the Department had retained the Klamath River Reservation under the act and that it was a part of the Hoopa Valley Reservation.
Among the circumstances he relied upon were the following:
(a)' The letter of January 19, 1865 from Superintendent Wiley to the Commissioner, stating that it was his intention to extend the Hoopa Valley Reservation so as to include the Klamath River Reservation “or it will be kept up as a station attached to that reservation and under control of the same agent” (finding 61, supra). This disposition, Mr. Shields noted, was approved by the Commissioner in his annual report for 1865.
(b) The Commissioner’s letters of August 14, 1877 and March 8,1878 to the Secretary, already quoted in finding 61, supra.
(c) The statement by the Secretary in his anual report for 1888 (at p. 76) that:
Indians have continued to reside on the Klamath River lands, and those lands have been and are treated as in a *921 state of reservation for Indian purposes, the jurisdiction is under the U.S. Indian agent for the Hoopa Valley agency.
(d) The rejection by the Commissioner in 1883 of an offer to lease the salmon fisheries of the Klamath River and to cut timber on its lands, with a statement that “The reservation is still in a state of Indian reservation, and must so remain, uninterfered with, until otherwise ordered by competent authority.”
(e) The circumstances of the approval by the Secretary, in 1883, of a recommendation that allotments be made to the Indians of the Klamath River Reservation (see findings 55, 65(c), supra) and the circumstance that in the same year the Secretary, in an appeal in a Land Office proceeding involving the lands of the Klamath River Reservation (2 L.D. 460) had held that the lands were since the act of 1864 regarded as in reservation, noting that allotments had been made and that when the selections were all1 made he would consider the question of restoring the remainder to the public domain. The allotments which had been made were abandoned when the underlying survey was found to be erroneous and fraudulent. Another survey was made in 1886 and meanwhile land officers were instructed to permit no entries or filings on Indian lands.
Mr. Shields stressed that the Mission Reservation, created under the same act as that under which the Hoopa Valley Reservation was created, was in accordance with orders of four Presidents composed of 19 different noncontiguous parcels.
On the basis of the foregoing data and considerations, Mr. Shields gave his opinion that the Klamath River Reservation was part of the Hoopa Valley Reservation, one of the four reservations authorized by the act of 1864, and that intruders could therefore be removed. It followed, he said, that the Indians thereof could be allotted under the General Allotment Act of February 8, 1887 (finding 59, supra).
Mr. Shields then turned to the district court opinion in the Hume case, which he recognized to be contrary to his opinion, and a remedy for the defect the court had found in *922 the status of the Klamath River Reservation. The opinion itself was distinguished as dictum; the decision was said to be correct for the reason that the Klamath was a navigable stream from which fishermen could not be excluded.
The principal reason underlying the district court’s opinion was, in the view of the Assistant Attorney General, the absence of an executive order setting 'aside the reservation as part of the Hoopa Valley Reservation, an omission which could easily be supplied by an order, which the Assistant Attorney General held would be lawful, extending the Hoopa Valley Reservation to cover the area of the Klamath River Reservation:
Judge Hoffman concedes that the lands in question are yet in reservation, though not for Indian purposes; that they constitute a reservation in fact, but not in law; and the principal reason why the legality is questioned appears to be because there was no formal executive order setting apart or retaining it as part of the Hoopa Valley reservation. This difficulty may yet be removed by the President issuing a formal order, out of abundant caution, setting apart the Klamath river reservation, under the act of 1864, as part of the Hoopa Valley reservation, or extending the lines of the latter reservation so as to include, within its boundaries, the land covered by the former reservation, and the intermediate lands, if the title to the last be yet in the United States. Such an order would be in accordance with the precedents in relation to the Tule river, Round Valley, and Mission reservations, the legality of which, as herein shown, has been repeatedly recognized by the legislative and executive branches of the government. I am therefore of the opinion that the Hoopa Valley reservation “may be legally extended, so as to cover the ground of the Klamath reservation.”
72. On January 21,189,1, the day following Assistant Attorney General Shields’ opinion to the Secretary, the Secretary requested the Commissioner to prepare the necessary orders for extension of the Hoopa Valley Reservation.
73. The response was delayed until May 5, 1891; Acting Commissioner Belt explained that the reason for the delay was that “a bill for the disposition of the Klamath reservation was pending, which it was thought might become a law with amendments satisfactory to the Department.” (This was *923 presumably a reference to possible Senate action on the bill passed in the House in September 1890 in the 51st Congress (finding 68, supra).) The response transmitted to the Secretary a draft of an executive order which provided for extending the Hoopa Valley Reservation to include a tract of land 1 mile in width on each side of the Klamath River from the present limits of the reservation to the Pacific Ocean. Acting Commissioner Belt implied that 'he had adopted the suggestion of the Assistant Attorney General — that an extension include the land between the two reservations — because of Agent Folsom’s report on the Indians of the intermediate strip (finding 49(f), supra).
74. On October 12, 1891, Secretary Noble transmitted to the President, requesting his signature, a draft of the executive order extending the Hoopa Valley Reservation. Among the enclosures was Assistant Attorney General Shields’ opinion (finding 71, supra), which, the Secretary said, contained a history of the reservation and “the reason for the issuance of an order in the premises.”
75. Four days later, on October 16, 1891, President Harrison signed the executive order; its terms, set out in finding 33, supra, extended the boundaries of the the Hoopa Valley Reservation to include the Klamath River Reservation and the Connecting Strip between the two reservations.
76. Congressional proponents of public sale of the Klamath River Reservation did not cease their efforts on the issuance of the executive order incorporating the Klamath River Reservation into the Hoopa Valley Reservation. Either unaware of or indifferent to the executive order, they continued to press for the public sale of the lands of the Klamath River Reservation and, in the House, even to forbid allotment to the Indians thereof.
77. On January 5,1892, 3 months after the executive order was signed on October 16,1891 (finding 75, supra), H.R. 38 was introduced in the House, declaring that all of the lands embraced in “what was the Klamath River Reservation” were to be subject to settlement, entry and purchase, with a proviso that the proceeds of sale should be a fund used by the Secretary for the “removal, maintenance and education” of *924 the resident Indians. H. R. 38, 52d Cong., 1st Sess. (1892); 23 Cong. Rec. 125 (1892).
Tbe House committee reported the bill with only an amendment changing the last-quoted phrase to read “removal, maintenance or education.” The committee report took the strong position that the reservation had 'been abandoned, as had been held by the federal courts, and that it was useless to allot any of its lands to the resident Indians, estimated by the report to be from 50 to 100 in number, because the Indians were “semicivilized, disinclined to labor, and have no conception of land values or desire to cultivate the soil”; that even if it were wise to allot lands to such Indians, these lands were unsuitable, whereas the nearby Hoopa Valley Ees-ervation was adapted for allotments; and finally that while the Indians had not been cared for by the Government since 1861-62, the Government might hereafter desire to do so, and for this purpose the proceeds of the sale of the lands should be a fund, for their removal, maintenance and education. H. E. Rep. No. 161, 52d Cong., 1st Sess. (1892). No mention was made, in the report or in the brief debate in the House (see 23 Cong. Rec. 1599 (1892)), of any extension of the boundaries of the Hoopa Valley Eeservation to include the Klamath River Reservation, of the Executive Order of October 16,1891 effecting that extension, or of any recent change in the status of the Klamath River Reservation.
The bill as reported passed the House (23 Cong. Eec. 1599 (1892)) but in the 'Senate was stricken and another version substituted so as to delete the reference to removal of the Indians and to provide that before public sale, the lands should be allotted under the General Allotment Act of 1887 as amended. In this, the Senate Committee “had the recommendation of the Interior Department to draw the bill as it is reported.” 23 Cong. Rec. 3918 (1892). As so amended the bill passed both House and Senate and became the Act of June 17, 1892, 27 Stat. 52. Neither the brief debate nor the two conference reports contain any mention of an extension of the boundaries of the Hoopa Valley Eeservation, the 1891 executive order or of any recent change in the status of the Klamath River Reservation. 23 Cong. Rec. 4225, 7771 *925 (1892); 23 Cong. Eec. 3918-19 (1892). There was a reference in the Senate debate to a nearby reservation, doubtless the Hoopa Valley Reservation, “where these Indians '[of the Kla-math River Reservation] can go if they want to.” 23 Cong. Rec. 3918, supra.
The proviso for allotments reads as follows (27 Stat. 52):
Provided, That any Indian now located upon said reservation may, at any time within one year from the passage of this act, apply to the Secretary of the Interior for an allotment of land for himself and, if the head of a family, for the members of his family, under the provisions of the act of February eighth, eighteen hundred and eighty-seven, entitled “An act to provide for the allotment of lands in severalty to Indians on the various reservations, and to extend the protection of the laws of the United States and the Territories over the Indians, and for other purposes,” and, if found entitled thereto, shall have the same allotted as provided in said act or any act amendatory thereof:
With elimination of the word “removal,” the last proviso, with respect to the proceeds of public sale, reads as follows 27 Stat. 53):
Provided further, That the proceeds arising from the sale of said lands shall constitute a fund to be used under the direction of the Secretary of the Interior for the maintenance and education of the Indians now residing on said lands and their children.

Allotments on the Hoopa Valley Reservation

78. (a) At the time of the issuance of the Executive Order of October 16, 1891 extending the boundaries of the Hoopa Valley Reservation to include the Klamath River Reservation and the enactment of the Act of June 17, 1892 for allotment and public sale of the lands of the Klamath River Reservation, the situation as to allotments on the now three parts of the Hoopa Valley Reservation was as follows.
(b) On November 29, 1887, within the year of the enactment of the General Allotment Act of 1887 (finding 59, supra), executive authority had been given for surveys preliminary to allotments in the Hoopa Valley Reservation, then consisting of the Square only. The survey was under *926 way in 1889 and allotments were made temporarily until the survey could 'be completed.
(c) Preliminary work for allotments on the Klamath River Reservation had been begun in 1883 and fallen through (findings 55, 65(c) and 71, supra). Presidential authorization would be unnecessary for such allotments, for the act of 1892 (preceding finding) had supplied the requisite authority by its direction that allotments on those lands take place in accordance with the General Allotment Act.
(d) Presidential authority would be necessary for allotments on the Connecting Strip, land which had never before had reservation status. Such authority was soon supplied, and work on allotments on all three parts of the enlarged reservation continued and undertaken; it was executive policy to make the allotments on the reservation permitted by law (and in the case of the tract constituting the former Klamath River Reservation it was also the Congressional mandate).
79. The instructions to the allotting agents in the field, the accompanying departmental and Presidential correspondence, and the allotments made are the subjects of the following findings.
80. Allotments on the former Klamath River Reservation and the Connecting Strip were first brought up, after the enactment of the Act of June 17, 1892, by instructions proposed to foe sent to the allotment agent. Such instructions were submitted for approval by Acting Commissioner Belt to Secretary Noble on September 23,1892. The instructions are quoted in the finding next following, at the point of time when they were approved and dispatched.
On September 29,1892 the Secretary reported to the President and requested authority for allotments on the Connecting Strip, as follows:
By Executive Order of October 16,1891, the limits of the Hoopa Valley Indian Reservation, in California, were extended so as to include a tract of country one mile in width on each side of the Klamath River and extending from the present limits of the said reservation to the P,onifirt lli>non
By the Act of June 17,1892 (Public No. 84), the lands in what was the Klamath River Reservation, in Cali *927 fornia, comprising a strip of country one mile in width, on each side of the Klamath River commencing at the Pacific Ocean and extending up said river a distance of twenty miles, may be allotted and reserved as therein provided.
It is reported by the Commissioner of Indian Affairs that not more than forty allotments will be claimed by Indians who are residents on the original Klamath River Reservation, but that four hundred and seventy-five Indians reside on the strip of country between the two original reservations and on this strip there are several so-called Indian villages.
The Commissioner is of opinion that when the lands are allotted under the Act of June 17, 1892, allotments should also be made to the Indians on the strip.
Concurring in the views of the Commissioner, I have the honor to recommend that authority be granted for allotments in severalty under the Act of February 8, 1887, as amended by the Act of February 28,1891, to the Indians on the strip of country added to the Hoopa Valley Indian Reservation in California by Executive Order of October 16,1891, except that portion embraced within the original Klamath Reservation, on which allotments are authorized by the act referred to, and for the necessary surveys, and that your authority be endorsed hereon.
President Harrison approved, on September 30, 1892, by signing a memorandum presented by the Secretary reading “Relative to allotments to Indians located on strip of country added to Hoopa Valley Reservation, California, and for necessary surveys of same.”
On October 8,1892 the Secretary transmitted to the Commissioner the President’s authorization, appointed Ambrose H. Hill “to make these allotments and also the allotments on the original Klamath River Reservation” and approved the draft instructions submitted to him on September 23 (supra), upon which the Commissioner sent the instructions to Mr. Hill.
81. The letter of instructions to Special Agent Hill of September 23, 1892, first dealt with the 'allotment of the lands of what was the Klamath River Reservation. The 1892 act was described; the agent was to advise the Indians of their opportunity and have them sign an application. The letter recognized explicitly the applicability to allotments of *928 both the General Allotment Act and the act of 1892, both generally and in the following paragraph:
The allotments are to be made under the Act of February 8,1887, “or any act amendatory thereto.” Said Act has been amended by the Act of February 28,1891. Under the former act as amended by the latter, each and every Indian located on the reservation, (Original Kla-math River) is entitled to 80 acres of agricultural land, or a double quantity of grazing land. No Indian is entitled to an allotment unless he was located on said reservation on the 17th of June, 1892.
The letter of instructions then gave a series of detailed procedural rales for the making of allotments, and went on to the subject of 'allotments on the Connecting Strip.
82. In opening the discussion of the Connecting Strip the instructions mentioned the extension of limits of the Hoopa Valley Reservation by executive order of the prior year to include not only the “original Klamath River Reservation” but also the “connecting strip” of 2 miles centered on the river. Allotments to Indians on the Connecting Strip were, it was noted, not authorized by the Act of June 17,1892, but were to be made by authority of the President under the General Allotment Act, the Act of February 8, 1887, as amended February 28, 1891:
By an Executive Order, dated October 16, 1891, the limits of the Hoopa Valley Reservation were extended so as to include a tract of country one mile in width on each side of the Klamath River, and extending from the limits of the Hoopa Valley Reservation, as then existing, to the Pacific Ocean, “Provided, however, That any tract or tracts included, within the above described boundaries to which valid rights have attached under the laws of the United States are hereby excluded from the reservation as hereby extended” — This extension of the Hoopa Valley reservation included the original Klamath River reservation, the subject of the foregoing instructions and of the Act of June 17,1892, and also a strip of country 1 mile in width on each side of the river, between the two reservations. This connecting strip is not included in the provisions of the Act, but the President has authorized allotments to be made to the Indians located thereon. As soon, therefore, as you complete the allotments on the original Klamath River Reservation you *929 will proceed to make those on the connecting tract. Agent Beers reports that these Indians number some 475. Allotments should he made under the foregoing instructions except that as they are not required to apply for allotments, you need not have them sign an. application. You wiU observe that tracts to which valid rights have attached are excepted from the reservation and are therefore not subject to allotment. I enclose for your information list of entries within the strip.
The “foregoing instructions,” mentioned in the third-from-last quoted sentence, were a reference to the detailed procedural instructions earlier given for the making of allotments on the former Klamath River Reservation.
83. Hill proceeded to the reservation and on February 13, 1893 he submitted a schedule, approved on August 11,1893, of 161 allotments of “lands allotted to Indians located on the Original Klamath River Reservation.” The allotments varied widely in size, from 8 to 160 acres, averaging approximately 60 acres each, to a total of 9,762 acres. Of the 161 allottees, two are known to have been Indians of Hoopa blood who had resided on the lands of the original Klamath River Reservation for many years prior to receiving, their allotments.
84. In February, 1894, Charles W. Turpin succeeded Hill and undertook the completion of allotments on the Connecting Strip.
The instructions to Turpin, from Acting Commissioner Frank C. Armstrong, dated February 21, 1894, in relevant part read as follows:
Having been assigned to the duty of allotting lands to the Indians of the Hoopa Valley Reservation in California, the following instructions are 'given for your guidance.
By an Executive Order, dated October 16, 1891, the limits of the Hoopa Valley Reservation were extended so as to include a tract of country one mile in width on each side of the Klamath River, and extending from the limits of the Hoopa Valley Reservation, as then existing, to the Pacific Ocean, “Provided, however, That any tract or tracts included within the above described boundaries to which valid rights have attached under the laws of the United States are hereby excluded from the reservation *930 as hereby extended.” This extension of the Hoopa Valley Reservation included the original Klamath River Reservation, (which extended up the Klamath River one mile in width on each side for a distance of twenty miles) and also a strip of country one mile in width on each side of the river between the Klamath River and the Hoopa Valley Reservations.
The allotments on the Klamath River Reservation have all been made and approved.
On the connecting strip Special Agent Hill has made 246 allotments and submitted duplicate schedules thereof to this office.
* # * * ❖
Your first duty will be to complete the work of making allotments on this connecting strip, of which Special Agent Hill reports that some 12 miles, on which are located about 125 Indians, remains to be allotted.
Allotments on this strip were authorized by the President September 30,1892. They are to be made under the Act of February 8,1887, as amended by the act of February 28, 1891, by which every Indian located on the reservation is entitled to 80 acres of agricultural or a double quantity of grazing land. Special Agent Hill however found it impracticable in very many cases to give the Indians, or to induce them to take, anywhere near the quantity of land allowed ¡by the act. You will endeavor to allot them the full quantity where practicable, and where not, give them as much as they desire within the limit — much of the land is understood to be of no value to them.
ifc # :$« sj: :f:
3. Selection for orphans will be made by yourself and the Agent in charge of the Hoopa Valley Agency.
*****
5. The tracts given to each allottee should ordinarily be contiguous, but he may be allowed to select detached tracts if necessary, in order to give him a proper proportion of agricultural land, wood and water privileges. Forty acre tracts of agricultural land may be divided into fractional parts of 20, 10, 5, or 2*4 acres if necessary to secure to each family a due proportion of agricultural land.
6. Each Indian should be allowed to select his land so as to retain any improvements made by him....
7. A description of the tracts to which valid rights had attached at the date of the Executive Order of Octo *931 ber 16, 1891, was forwarded to Special Agent Hill March 14, 1893.
*****
Further instructions will be given you in regard to the allotment on the original Hoopa Valley Reservation. * * * * *
Upon receipt of these instructions you will proceed to the Hoopa Valley Agency and reservation for the purpose of making the allotments thereunder.
% ^ ❖ # *
I enclose copy of the act of February 8,1887, and also of act of February 28,1891.
85. Hill completed the allotments on the Connecting Strip in the year of his appointment, 1894, with the submission of a schedule of 253 allotments.
The Hill schedule was approved on June 23, 1898, and the Turpin schedule (with two exceptions) on June 27,1898. The total almost 500 allotments varied in size from 5 to 160 acres and averaged approximately 40 acres each.
Two of these allottees are known to have been of Hoopa blood. They had been residents of the Connecting Strip for some years.
86. Surveys for allotments on the Square, begun (finding 78(b), supra) when the reservation consisted only of the* Square, were completed on February 21,1894, and the Commissioner then recommended that the authority of the President, necessary under the General Allotment Act, be obtained for the making of allotments. Acting Secretary Hines on February 23, 1894, requested Presidential authorization “for the making of allotments on the Hoopa Valley Reservation” under the General Allotment Act, and the President having on March 9, 1894 signed an order reading “Relating to the allotment of lands on the Hoopa Valley Reservation, California,” the authorization was on March 12,1894 transmitted to the Commissioner, who transmitted instructions to Special Agent Turpin on December 18, 1894.
87. The instructions of December 18,1894 to Special Agent Turpin, after reciting the President’s authorization for allotment of lands, stated:
This reservation was established by the executive orders of November 16, 1855 and June 23, 1876 and em *932 braces some 89,572 acres, the number of Indians located thereon being estimated at 475. The greater portion of the land is not susceptible of cultivation. In fact it is doubtful if there is over 3500 acres of arable land in •the reservation.
Eeference was made to a body of arable land located remotely on the reservation, not yet surveyed; a road to this land was under construction. Turpin was to survey this land and to make allotment of the lands already surveyed.
The instructions recognized that lands in the valley proper would be insufficient for full-sized allotments to those who might be entitled, and it was suggested that 5 or 10 acres of the available valley land be alloted, each Indian being allowed to retain his improvements, and that the allotments be filled out with lands “in other parts of the reservation”:
With regard to the lands in the Hoopa Valley you will consult freely and fully with Capt. Dougherty, and endeavor to satisfactorily adjust the holdings of the Indians to the surveyed lines. The lands in this valley should be divided as equitably as possible among the Indians located thereon, each Indian being allowed to retain his improvements. It is not expected that these lands can be allotted in full quantity, but those in possession may be given 5 or 10 acres, 'and more in cases where' they have improved the same if it can be done without injustice to others. Capt. Dougherty is thoroughly familiar with the situation and will doubtless cheerfully aid you in this work. As far as practicable the allottees should be allowed to fill out their allotments by taking the balance in other parts of the reservation.
In other respects you will be governed by the instructions given you February 21,1894, for your guidance in making allotments on the addition to the Hoopa Valley Reservation.
88. In 1896, Turpin proposed about 395 partial allotments on the Square of small tracts of about 5 acres of agricultural land, most of them in the valley proper. Grazing and timber lands were not allotted, and the Commissioner reported that further surveys would be necessary before the allotments could be completed.
Years passed, however, and the schedule of allotments was *933 not approved because “many of the selections were described hy metes and bounds and further surveys were necessary.”
A new survey was ma'de in 1915, and was approved in 1917.
89. On June 19, 1916, an ad hoc council of Indians, convened to pass on the applications of Indians from off the reservation for enrollment on the reservation with a view to obtaining allotments, petitioned the Commissioner, urging that outsiders, and particularly Klamaths, not be recognized as having any rights to the lands of the reservation (by which they meant the Square), which they wanted kept for members of the Hoopa Tribe alone.
The directions of the Indian Office to convene the council are the subject of finding 102, infra, and the council’s place in the history of tribal organization is the subject of finding 110, infra. The letter is set out here, for its relevance to the subject of allotments:
We, the members of the Hoopa Indian Council, representing the tribes of Klamath, Redwood, and the other tribes that come under the Hoopas, do hereby write a few lines in explanation of certain conditions existing on the Hoopa Reservation in regard to the allotments that are now pending. In the first place there are Indians living on the Reservation that we think have no tribal rights here, they having no Hoopa blood in their veins. And besides these there are a great many outside Indians that want to get land here. There are certain tribes that are regarded as having tribal rights on the Hoopa reservation. This we cannot understand. Take the Klamath for instance — they represent a different tribe, talk a different language, and have never associated with the Hoopas to amount to anything. As near as we can understand the Hoopa and Klamath River reservation were allotted twenty some odd years ago. The Klamath are to-day enjoying the rights of their allotments, own their land and homes. While the Hoopas have had their land resurveyed and now are waiting to receive their allotments and are still uncertain about our land, and still they say we are linked with the other tribes. Surely there must be a mistake somewhere. This we would like to have looked into and corrected. We as members of the Hoopa Indian Council, knowing the real conditions that exist on the Hoopa Reservation, do hereby say that taking all things into consideration — the amount of land — the number of *934 real Hoopa Indians, that members of the Hoopa tribe as an average are having a hard time to make a living on the l'and they are now working. And to crowd us still closer would be reducing some to poverty. This we do not wish to see, as we are looking forward to the future. To you therefore, the Commissioner of Indian affairs, we ask to do all in your power to have the Hoopa Reservation set aside for the members of the Hoopa tribe, that they may get enough land to make a living on. All we ask is to be given an equal chance.
90. On July 17,1918, pursuant to the new survey (finding 88, supra) Superintendent Mortsolf was instructed to make allotments in the Hoopa valley proper and in the grassland area of the Square known as Bald Hills. There were about 1600 acres of arable land in the valley and 2000 acres of grazing land in Bald Hills. (The rest was largely timberland, the source of the present controversy.)
On March 2,1922, and July 25,1923, there were approved 365 allotments in the valley and at Bald Hills, listed on an original and three supplementary schedules, designated A, B and C, submitted by Superintendent Mortsolf. The allotments were small, averaging 8 acres.
A Mortsolf Schedule D of 38 allotments, submitted on December 10, 1921, and a Schedule E of three additional allotments, submitted on February 12, 1924, were not approved because they had not been surveyed.
There the matter rested for almost 10 years, until 1932.
91. On November 2, 1932, Commissioner Rhoads directed Special Allotting Agent Charles E. Roblin to proceed to the Hoopa Valley Agency to confer with Superintendent Bog-gess concerning the making of further allotments on the Square and a general study of the allotment situation there.
Agent Roblin made a first report by letter of November 19, 1932 in which he concurred in a recommendation of the Forest Service that land covered by forest or heavy brush or otherwise rendered unusable for agricultural or grazing purposes should be retained as tribal land. Such lands, he wrote, constituted a “very large percentage” of the reservation lands; there remained for allotment only a “very limited area” of agricultural land and other land which *935 might profitably be used by individuals, the majority of the suitable lands having been disposed of by the 365 allotments made in 1922 and 1923. These former allotments he described as “apparently provided for the Indians of the Hoopa Valley Eeservation, California, who were then entitled to lands in allotment by reason of use and occupancy, under instructions theretofore issued.”
92. Eoblin dwelt in detail on the large number of possible claimants, estimating that 600 Indians of those on the Connecting Strip and the Square would probably seek allotments:
The Hoopa Agency census rolls for 1932 show the following numbers of persons:
Hoopa Valley (original Hoopa Valley Eeservation)_ 561
Klamath Eiver (original twenty mile strip from Pacific Ocean, along Klamath Eiver)_ 608
Lower Klamath (Connecting strip along Klamath Eiver, between original Klamath Eiver Eeservation and original Hoopa Valley Eeservation)_ 373
Total_1,542
Of these persons it is probable that only those of the the original Hoopa Valley Eeservation and of the connecting strip will desire allotments on the Hoopa Valley Eeservation. These total 934. The available record does disclose how many of these are without allotments; but, as the original allotment rolls covered only 365 allot-tees, and as a certain proportion of these are now deceased and so not now on the census rolls, a conservative estimate would indicate that at least 600 of those now on the rolls are unallotted.
93. Assistant Commissioner Scattergood acknowledged Eoblin’s report on December 13, 1932. Noting that on some reservations the Indians, rather than receiving allotments, had received assignments by which the occupant was permitted to live upon and improve a tract as if it were his own so long as he made beneficial use of the land, Scattergood requested Eoblin’s views on the advisability of making assignments rather than allotments on the Square.
Eoblin responded by letter of January 12, 1933, in which he recommended that the persons named on Mortsolf’s Schedules D and E (finding 90, supra) should have those tracts allotted to them, and that claimants whose selections *936 covered land which would not require supplemental surveys should have that land allotted to them, provided their “enrollment on the Hoopa Valley Agency rolls has been regular and they are entitled to allotment,” but that the lands which would require supplemental surveys if allotted and certain other lands surveyed but selected by children born subsequent to a certain date should be as assigned rather than allotted. This letter was “read and approved” by Superintendent O. M. Boggess.
94. In his letter of December 13, 1932 Scattergood had also asked Eoblin for details of the cases of 125 Indians whose claims to an allotment, Eoblin had reported, were in doubt. Scattergood asked on what the claims were based and why their rights were considered doubtful.
Eoblin replied, in his letter of January 12, 1933 (a letter which as noted was read and approved by Superintendent Boggess) as follows:
In my report of November 19,1932, (L-A, 50666-32), I reported that selections had been filed by or on behalf of 125 persons whose right to allotment “is in doubt”; and the Office requests information as to the basis of these claims and ‘‘why the right to allotment is considered as in doubt”. A check of the annual census reports for 1932 shows that all these claimants are carried on the rolls at Hoopa Valley Agency, either as “Hoopa” Indians, “Klamath Eiver” 'Indians, or as “Lower Klamath” Indians. The Lower Klamath Indians are those living on or belonging with those who were allotted on the “Kla-math Eiver” reservation created November 16, 1855, extending for a width of one mile on each side of the Kla-math Eiver for a distance of twenty miles up from the mouth of that river. The unallotted portion of that reservation was returned to the public domain under authority of the Act of Congress approved June 17, 1892. The Hoopa Indians are those living on or belonging with the Indians of the “Hoopa Valley” reservation created August 21, 1864 and confirmed by Executive Order of June 23, 1876 in compliance with the Act of Congress approved April 8,1864. The Klamath Eiver Indians are those living on or belonging with the Indians of the Addition to the Hoopa Valley Eeservation created by Executive Order of October 16,1891, which addition is a strip extending for a width of one mile on each side of the Klamath Eiver for a distance of approximately *937 twenty-seven miles down that river from the northern boundary of the original Hoopa Valley reservation to join the original Klamath River reservation. This is generally known as the “connecting strip”. See note, page 6.
Under date of July 8,1930 (L-A, 32789-30), the Office advised the superintendent of the Hoopa Valley Agency that the Hoopa Valley Reservation “was created under the authority contained in the act of April 8, 1864 (13 Stats., 39-40), for the accommodation of the Indians of the State of California, and was intended to include both branches of the Klamath River tribe”, and that the so-called connecting strip “is considered merely to be an addition to the Hoopa Valley Reservation”.
The doubt as to the allotment rights of the 125 claimants mentioned seems to be very indefinite, and based largely on a desire of the Hoopa Indians to exclude the Klamath River and Lower Klamath Indians from allotment on the original Hoopa Valley Reservation, and also on a desire of the Hoopa Valley Agency officials to limit as far as possible the number of additional allotments to be made. This list also includes most of those who have heretofore been allotted field or grazing allotments and are now asking for “house lots” or additional areas of one sort or another. Two of these have received patents in fee for their original allotments, have sold them, now find themselves without title to any land on the reservation in their own right, and are applying for house lots or other land for themselves. These should probably be denied.
The rights of some are questioned because they were not living on the reservation when allotments were made in 1917 and 1918, but (have moved onto the reservation since to secure better school facilities or some other advantage.
However, all these applicants are on the Hoopa Valley Agency rolls and are carried on the annual census reports; and as the Hoopa Valley Reservation was created as one of several reservations to be set apart for the “Indians of California”, it is my opinion that the objection to the rights of these claimants, as a class, should be disregarded. In some few cases the objections may be substantiated by an investigation which would result in striking the names from the official rolls; but these cases would be very few.
‡ ‡ ‡ ‡
[p. 6] Note. Page 1. The statement made by me on page 1 of this letter 'as to the status of “Klamath River” and “Lower Klamath” Indians, is not in accord with the *938 statement in the fourth paragraph of page 1 of my letter of November 19, 1932, (L-A, 50666-32). I am advised that these two census rolls are inextricably mixed; that some years ago it frequently happened that Indians were changed from one roll to another by reason of intermarriage between Indians of the different rolls, or by reason of change of residence from one part of the Klamath country to another part. Some of this confusion seems to arise because the Klamath Indians themselves have a custom of designating all Indians living below a certain point on the Klamath River as “lower Klamaths”, and those living above that point as “upper Klamaths”. This point seems to be above the village of Weitchepec; and this would leave all of the original Klamath River Reservation and all of the connecting strip or Hoopa Valley Addition in the “Lower Klamath” country. However that may be, the Indians of the “Kla-math River” and “Lower Klamath” census rolls are equally entitled to rights on the Hoopa Valley Reservation and on the addition thereto.
The officials of the Hoopa Valley Agency realize that these rolls are not accurate and that they cannot be accurately reconciled without a field census being taken. They desire that such a census be authorized.
95. Roblin’s recommendations with respect to the D and E schedules and to assignment rather than allotment were approved by the Commissioner on February 20, 1933.
96. By letter of February 20, 1933, Commissioner Charles J. Rhoads advised Superintendent Boggess that approval of the Mortsolf D and E schedules would be given. No further allotments would, however, thereafter be made, he wrote, because Indians of the Connecting Strip and the Lower Klamath Strip (which he called the “former Klamath River Reservation”) would all be equally entitled to allotment on the Square (which he termed the “original Hoopa Valley Reservation”), and the available agricultural and grassland would be sufficient for so small a number of those qualified as to work injustice. The land would rather be assigned to those who would engage in actual beneficial use.
The relevant portion of his letter reads as follows:
We have come to the conclusion that allotment schedules “D” and “E”, referred to by Mr. Roblin in his letter of January 12,1933, which were submitted several years *939 ago but which, were not then approved because of the need for additional surveys, should now be brought up to date and submitted for further consideration. * * * We feel that these unallotted qualified Indians ‘have the strongest claims to allotments of any of the Indians on the reservation.
We do not believe that further allotments should be made after the schedules referred to have been approved. Indians of the “Connecting Strip” and of the former Klamath River Reservation would be entitled to allotments equally with those liming on the original Hoopa Valley Reservation, and it clearly appears from the reports that there would only be sufficient agricultural and grazing land on the reservation to allot a very small proportion of these Indians. Hence, it would be practically impossible to determine which Indians should be given and which denied allotments so as not to work an injustice upon certain individuals. *****
* * * yy6 believe it would be better to leave the lands in their present status, and assign the remaining un-allotted agricultural and grazing lands to individuals Who actually wish to make beneficial use thereof.
For the reasons given after the schedules referred to above are approved, no further allotments at Hoopa Valley will be made at this time. [Emphasis added.]
Assignments were thereafter made, pursuant to Commissioner Rhoads’ foregoing decision.
97. Most of the allotments on Mortsolf’s Schedules D and E were thereafter, in 1933, approved; a few were delayed, for reasons not material, until 1950.
98. The Indian Reorganization Act of June 18, 1934 (48 Stat. 984) provided, inter alia, if the Indians of a reservation so voted, for an end to any allotments of Indian land in sev-eralty, for continuation of any restrictions on alienation on any Indian lands and for the restoration to tribal ownership of any remaining surplus lands of any Indian reservation.
Section 18 of the act provided in pertinent part as follows (48 Stat. 988):
This Act shall not apply to any reservation wherein a majority of the adult Indians, voting at a special election duly called by the Secretary of the Interior, shall vote against its application * * *.
*940 Two elections were held on the Hoopa Valley Reservation, one for the Klamaths and one for the Hoopas. In a letter of October 20, 1934 Commissioner Collier advised the District Coordinator for the Reorganization Act that Superintendent Boggess was authorized to hold separate elections for the Hoopas and for the Klamath Indians, as follows (65 Dec. Int. Dept. 59, 68)
Superintendent Boggess is authorized to hold two separate elections on the Hoopa Valley Reservation, one of them on Hoopa Valley proper for the Hoopa, and another election on the territory occupied by the Klamath Indians, when the Secretary calls such election.
Tn both elections, held December 15, 1934, the vote was overwhelmingly against the applicability of the act.
89. All told, assignments of land on the Square were made to nineteen Indians, known to be non-Hoopas, of the Lower Klamath or Yurok tribe and of the Upper Klamath or Karok tribe.
100. (a) All told, 35 Indians known to be non-Hoopas, of the Lower Klamath or Yurok tribes, the Upper Klamath or Karok tribe and the Redwood tribe, received allotments on the Square. Most of the allottees on the Square were, of course, Hoopas.
(b) Four Indians known to be of Hoopa blood received allotments on the Addition. Most of the allotees on the Addition were, of course, Yuroks.
(c) The non-Hoopas allotted on the Square were connected with the Square by residence there or by parentage, their parents having resided on the Square.
(d) The Hoopas allotted on the Addition were connected with the Addition by residence there.

Administrative Rulings

101. In connection with the allotment program, officials of the Indian Office on a number of occasions ruled that Indians of the Addition and the Square — Klamaths and Hoopas and others — were equally entitled to rights in the entire reservation as enlarged and, specifically, in the Square. These rulings are detailed in the following findings.
*941 102. In 1915, while surveys for the final allotments on the Square were under way, there were several cases of Indians from outside the reservation who unsuccessfully sought to be enrolled with the Indians of the reservation with a view to becoming eligible for an allotment. One such applicant, James McDonald, was a half-Yurok who had lived on the Addition for some years.
C. F. Hauke, the Chief Clerk of the Indian Office, directed that McDonald show by affidavit the dates of his residence on the reservation, how “tribal relationship has been maintained,” and that the matter then be presented to a council of Indians of the Hoopa Valley Reservation for an expression of views as to whether he and his children were considered to be “recognized members of the tribe.”
On November 8,1915, Superintendent Mortsolf at Hoopa Valley advised that as instructed he had convened a council of five Indians, who had rejected McDonald’s application as well as those of three other Indians, for the same reasons, stated as to McDonald as follows:
* * * James McDonald is not of Hoopa blood, and has no realtives [sic] either living or who have lived here; that he has never lived here, and that the quantity of land here is not any more than sufficient for the people who have always lived here.
On December 2,1915, Hauke inquired of Mortsolf whether the Council “represented all the tribes having rights on the Hoopa Valley Reservation, or only the Hoopa Tribe,” and on the following January 15 Hauke requested that new applications be submitted, giving details of birth and Indian blood and stating whether the applicant’s parents were “enrolled and recognized members of one of the tribes having rights on the Hoopa Valley Reservation and received benefits therewith.” Such new applications, he said, should be submitted to a council “representative of the tribes having rights on the Hoppa Valley Reservation” for an expression of their views as to whether the applicant or his parents have “at any time been considered as recognized members of one of these tribes.”
*942 Mortsolf asked for guidance as to what tribes had rights on the reservation, as follows:
I am not, nor never have been sure just what tribes have rights on the Hoopa Valley Eeservation, never having seen a copy of the Act of Congress approved April 8, 1864 which is referred to in the Presidential proclamation determing [sic] the reservation.
I will thank the Office to send me this information which now is necessary for me to have in order to determine whether any council would be representative of all tribes having rights here.
To this Hauke replied on February 19,1916 that the tribes occupying and belonging to the Hoopa Valley Eeservation were the “Hunsatung, Hup a, Klamath Eiver, Miskut, Eed-wood, Saiaz, Sermalton, and Tishtanatan”:
The Act of Congress approved April 8,1864 (13 Stat. L., 39), mentioned in Executive Orders of November 26, 1902 [an error], June 23, 1876 and October 16, 1891, ■makes no reference to the tribes having rights on the Hoopa Valley Eeservation.
The tribes living on the reservation that have participated in tribal benefits and been recognized as belonging on the said reservation may be considered for the purpose of passing on applications for enrollment as having rights therewith.
From the annual report it will be noted that the following tribes are listed as occupying and belonging to the Hoopa Valley Eeservation: Hunsatung, Hupa, Kla-math Eiver, Miskut, Eedwood, Saiaz, Sermalton, and Tishtanatan.
(According to the Congressional Directory for 1916, Hauke was as Chief Clerk of the Indian Office the third ranking officer of the office. He followed in rank the Assistant Commissioner and preceded the chief inspector and the heads of the divisions.)
The defendant correctly characterizes Hauke’s letter as evidence of Indian Office treatment of the Indians residing on the Square, the Connecting Strip and the Klamath Eiver Eeservation as having a common interest in those three tracts regardless of where they resided.
In pursuance of Hauke’s instructions, Mortsolf added two *943 members to the council, explaining to Washington that to the extent possible they represented the tribes listed by Hauke. He wrote that the Hunsatung, Saiaz and Tishtana-tan were so scattered or intermarried with the Hoopa as to be extinct or unidentifiable, although councilman William Quimby was “a partial representative” of the Tishtanatan; that Hoopa “is the general name for practically all the minor tribes, which were represented at the time of the establishment of the reservation;” that the Redwood were once numerous but few were left, and that he had added William Stevens, “a full-blooded Redwood Indian,” to the council to represent the Redwoods.
Of the Klamaths, Mortsolf said that they were “numerous ;” that while “few of them live in Hoopa' Valley proper, there are many of them adjacent, who are landless and who wish to acquire reservation rights. David Maston, has been added to the Council, to represent this tribe.”
McDonald’s new application was submitted to the council as reconstituted and was rejected because, the minutes recited, McDonald “does not belong to any of the tribes entitled to enrollment on the Hoopa Reservation.”
Mortsolf then forwarded McDonald’s application and the minutes of the meeting at which it was rejected, with a letter, dated June 19, 1916, urging that the council’s action be approved. He said:
The case of James McDonald is typical of practically all of the applications for enrollment from outside the reservation, and should the Office approve of the action and wishes of the Council and reject said application, there will be no need to take up the other cases mentioned in previous correspondence, unless any applications are found to differ in some of the essential points. It will be noted that the Hoopa Council unanimously voted recommending that the application of James McDonald be rejected. This council is composed of Indians living on the Hoopa Valley Reservation proper and represente all of the tribes not now extinct enumerated in the act of Congress and presidential proclamation setting aside this as an Indian Reservation.
I hope that the Office may see fit to approve the recommendation and reject the application of James McDonald, insofar as his enrollment might entitle him to *944 land within the Hoopa Valley Reservation. There are so many of these outside Indians who will apply for land and so little agricultural land available that it would defeat the purpose of allotment if the number of Indians were materially increased.
(Mortsolf is patently in error in referring, at the end of the first-quoted paragraph, to “all the tribes not now extinct enumerated in the act of Congress and presidential proclamation setting aside this as an Indian Reservation.” There were no tribes enumerated in the act of 1864 (finding 10, supra) or in either of the two executive orders dealing with the Hoopa Valley Reservation (findings 29, 38, supra).)
On July 17, 1916, Hauke approved the rejection of McDonald’s application, on the ground that McDonald was “never enrolled and recognized as a member of any of the tribes receiving benefits on the Hoopa Valley Reservation, nor did he ever maintain tribal relations therewith” and that the “representative tribal committee” had refused to adopt him.
Mortsolf had, with his letter of June 19, enclosed a 'letter from the council of the same date, on the general subject of the rights of Klamaths to allotments; the letter is set out in finding 89, supra. Hauke’s letter of July 17 was addressed to Mortsolf and was a response to Mortsolf’s letter of June 19 and not to the council’s letter of the same date. Hauke does not mention the council’s letter, and no response to the council’s letter appears in the record.
103. The next ruling was made in connection with a protest of the allotments of Hoopa Valley land to a family named Horn, Karok or Upper Klamath Indians on the Turpin schedule, who were born on the Upper Klamath and came to Hoopa Valley in 1893. Superintendent Mortsolf reported as follows, on October 14,1918:
On the Klamath River there are two distinct languages spoken, namely, the Lower Klamath and the Upper Klamath. From the mouth up to and including Weitchpec, the Indians speak the Lower Klamath tongue and from above Weitchpec up as far a [sic] Happy Camp, the Upper Klamath River language is spoken. These languages are separate and distinct and I assume that there are two separate and distinct Indian tribes.
At the time the selections were being made in that *945 portion of the Reservation where the Horn allotments are located, a protest was made by James Jackson, Anderson Mesket and several others to the effect that the Horn family were not Indians who were entitled to lands in this Reservation.
It is my understanding that the Hoopa Valley Reservation was established by an act of Congress, April 8, 1864 (13 Stat. 39) for the use and occupancy of several tribes of Indians among whom were mentioned the Klamath River tribes. It has never occurred to me that any distinction might be made between those Indians of Klamath River who live on the Upper and Lower part. I have, however, taken testimony of several witness [sic] publicly bearing upon these allotments and am submitting the same herewith. It is my opinion that there is no good reason why the Horn family should not be allotted at this time. Under date of July ly[sic], 1918,1 was instructed by the Commission [sic] of Indian Affairs that those persons on the original allotment schedule should be given the privilege of making the first selections.
Chief Clerk Hauke, in a letter of April 22, 1919 (which both parties treat as the answering letter or an answer to a similar letter), agreed that the reservation was intended for the accommodation of the Indians of California, including both branches of the Klamath River tribe:
Receipt is acknowledged of your letters of... March 8, 1919, with respect to the rights of certain Indians belonging to the Upper Klamath Tribe or Band, to receive allotments with the Indians of the reservation under your charge.
Jh answer, you are advised that the Office concurs in your view, that the Hoopa Valley Reservation which was established by the Act of April 8, 1864 (13 Stat. L., 39-40), for the accommodation of the Indians of the State of California, was intended to include both branches of the Klamath River Tribe. Further no restrictions whatever are made in the Executive Orders relating to the reservation, nor is it believed that the protests of the few Indians thereof to members of the Upper Klamath Band, should be allowed to interfere with these Indians, who, in the main were placed on the allotment schedule made in 1895 by Special Allotting Agent Charles Turpin, as entitled to benefits of the Hoopa Valley Reserve.
*946 Allotments of Square land to members of tbe Horn family were ultimately approved, and were among the allotments to non-Hoopas (finding 100, sufra).
104. In 1927, again, Karoks, as Indians living in the immediate vicinity of the reservation, were held eligible to enrollment and to allotment, conditioned, however, upon their removal to the reservation, which was found not to have occurred in the case at hand. The Assistant Commissioner held that the reservation had been created in 1864 for all the Indians of California and that the extension of the reservation in 1891 to include the Lower Klamath Strip and the Connecting Strip was for the benefit of the Indians living along the Klamath.
The case was first presented on December 22, 1926, when Superintendent John D. Keeley wrote to the Commissioner concerning the applications of two Karok Indians, cousins, Rosa Sunderland and Linda Ince, for enrollment on the Hoopa Valley Reservation. Expressing some doubts as to whether the Karoks were a separate tribe or in reality the same as the “Klamath River Indians,” he said that “[i]f these people have any right to enrollment it would be through the Klamath River Indians.” He inquired “whether there is a distinction between the Klamath River Indians and the Hoopa Indians relative to tribal rights. Do the Klamath River Indians have any claim on the tribal lands of the twelve-mile square portion of the Hoopa Reservation?”
Mrs. Sunderland and Mrs. Ince had been born and raised at Happy Camp on the upper Klamath, above its junction with the Trinity, and thus off the reservation, and had apparently never lived on the reservation.
Assistant Commissioner E. M. Meritt responded on January 20, 1927, that the four reservations created under the 1864 act, of which the Hoopa Valley Reservation was one, were intended “to accommodate all the Indians of California” and that since the setting aside of the Hoopa Valley Reservation did not specify the tribes to occupy it and since the addition of the two Strips was for the benefit of the Indians along the Klamath, the Klamath Indians living in the immediate vicinity of the reservation had as much right *947 as any other Indians, conditioned, however, upon their removal to the reservation:
In your letter you ask to be advised as to whether or not the Klamath River Indians have any claim on the tribal lands of the twelve-mile square portion of the the Hoopa Indian Reservation. The twelve-mile square portion of this reservation was set aside by order of the Superintendent of Indian Affairs for California under authority of the Act of Congress of April 8, 1864 (13 Stat. L., 39), which authorized the setting aside of certain reservations for California Indians. These reservations were to be large enough to accommodate all the Indians of California. Neither the withdrawal nor the Act of Congress specified any particular Indians who were to occupy these reservations, and it is assumed that such Indians as are located in the immediate vicinity of the reservations are entitled to benefits thereon should they so desire. The one-mile strip on each side of the Klamath River was later added to the reservation for the benefit of the Indians living along the river. It is believed, therefore, that the Klamath River Indians have as much right on the reservation as any other Indians formerly residing in that part of the State of California, but it is believed that a removal to the reservation is necessary in order for them to obtain reservation land.
A second letter of May 11,1927 from the Superintendent gave more information as to the distinction between Upper and Lower Klamaths — Karoks and Yuroks — and advised that the upriver Karoks had never moved to or become residents of the reservation, as distinguished from the Yuroks, or downriver Klamaths, who lived on the Addition, from Weitchpec, at the junction of the Trinity and the Klamath, to the ocean. Accordingly, he wrote, only the Klamath Indians who lived from Weitchpec to the mouth of the Klamath River — that is, on the Connecting Strip and the Lower Kla-math Strip — were entitled to reservation rights and were entitled to enrollment.
There being Indians from the mouth of the Klamath River practically to its head waters. Those from the mouth to Weitchpec are on our rolls, and are for the most part allotted; those from Weitchpec to Orleans, *948 Happy Camp and up the river are not on the rolls of any agency so far as I know. * * *
=¡= * $ * *
It has been customary to assume or to say that all Indians of Del Norte and Humboldt Counties are under the jurisdiction of this Agency, however, the Indians from Weitchpec, up the river, are really public domain Indians and have never lived on any reservation. In view of the statement of your office in your letter of March 5, 1927, LA 586222 [not in present record] defining the Hoopa Valley jurisdiction, it would appear that the only Klamath Indians under this jurisdiction would be the lower Klamath Indians which I take to be those from Weitchpec to the mouth of the river.
Mrs. Sunderland and Mrs. Ince, as Upper Klamath Indians, were therefore, he continued, on the authority of the Commissioner’s letter of January 20, 1927 {supra) not entitled to enrollment, because not resident upon the reservation, and could become so entitled only if they lived in the immediate vicinity of the reservation and moved to the reservation:
* * * [Yjour office ruled that Dan Effman and family, formerly a Karok Indian of the Happy Camp band, was entitled to enrollment here, he having resided here on the Reservation for a number of years. In view of the statements in your letters above * * * referred to, it would appear that the upper Klamath River. Indians, among which is the Karok band, are not within the jurisdiction of this Agency, and that the only way they could place themselves within the jurisdiction of this Agency would be to move to the Reservation and establish a residence thereon provided they were, prior to their removal to the Reservation, living in the immediate vicinity of this Reservation. It would appear from this that Mrs. Sunderland and Mrs. Ince would not be entitled to enrollment or allotment on this Reservation as they do not comply with any of the requirements cited above.
Accordingly, Mrs. Sunderland and Mrs. Ince were denied enrollment on the ground that neither they nor the tribe of which they were members, the Karoks, had moved to the reservation.
105. Lawrence McCarty, a Yurok born on the Square who *949 lived there until be was 1'5, in 1920, and then worked off tbe reservation, living there part-time, applied for enrollment in 1931, with a view to selection of land on the Square which he hoped to have allotted to him.
Superintendent Boggess forwarded his application to Washington on February 12,1931, saying:
Mr. McCarty desires to select land within the twelve mile square of the Hoopa reservation and inasmuch as in a previous letter the Office informed me that Klamath Indians might select land therein there appears to be no objection to the arrangement.
I, therefore, recommend approval of his request as submitted.
Commissioner Rhoads approved the application on March 9,1931, as follows:
As he was born on the reservation of Indian parents, at least, one of whom was allotted, he is entitled to enrollment under the Oakes case (172 Fed. Rep., 305), and you are authorized to enroll 'him under Section 324 of the Indian Office Regulations of 1904.
106. On July 8, 1930 Commissioner Rhoads in a letter to Superintendent Boggess advised that there being no restrictions in the executive order which in 1891 added areas to the reservation, an Indian of the Connecting Strip could exchange his allotment for one on the square. The opinion was expressed in broad terms, generally permitting exchange of an allotment for another on the original reservation or within the areas added:
The receipt is acknowledged of your letter of June 14, 1930 regarding allotment rights on the Hoopa Valley Reservation and the additions thereto.
The Hoopa Valley Reservation was created under authority contained in the Act of April 8, 1864 (13 Stat. 39-40), for the accommodation of the Indians of the State of California, and was intended to include both branches of the Klamath River Tribe. The so-called connecting strip which was added to the reservation by Executive Order of October 16,1891 is considered merely to be an addition to the Original Hoopa Valley Reservation. No restrictions whatever are made in the Executive Order relating to the reservation and no reason is seen *950 why any Indian who holds his allotment in trust should not be permitted to change his land for vacant lieu land on the original reservation or within the areas added thereto.
107. Special Allotting Agent Eoblin expressed the opinion in his letter of January 12,1933, that Indians of all the three parts of the reservation were equally entitled to lands on the Square (finding 94, supra). He said that the Indians of the “Klamath Eiver” and “Lower Klamath” census rolls, by which he meant the Lower Klamath Strip and the Connecting Strip “are equally entitled to rights on the Hoopa Valley Eeservation and on the addition thereto.” He had tacitly assumed this, in his earlier report of November 19,1932, that the Indians of the Lower Klamath Strip would probably not desire allotments from the lands remaining unallotted on the Square, and that 600 of the 934 Indians on the Connecting Strip and the Square would desire such allotments.
108. Commissioner Ehoads on February 20, 193S halted allotments, and directed that the remaining land on the Square be assigned, on the ground that Indians of the Addition and of the Square were equally entitled to allotments, and that there was insufficient land for allotment to all who would be entitled. The central portion of his ruling, more fully quoted in finding 96, supra, reads as follows:
Indians of the “Connecting Strip” and of the former Klamath Eiver Eeservation would be entitled to allotments equally with those living on the original Hoopa Valley Eeservation, and it clearly appears from the' reports that there would only be sufficient agricultural and grazing land on the reservation to allot a very small proportion of these Indians.

The Hoopa Business Council of 1933

109. Historically, the Indian tribes who occupied or settled upon the Hoopa Valley Eeservation were not politically organized, had no tribal government, at least in peacetime, and after the Hoopa Valley Eeservation was established did not participate in its administration. This state of affairs continued until 1915.
110. (a) In 1915-16, in connection with applications for *951 enrollment with a view to allotment, 'Superintendent Mort-solf convened a council which the Indian Office directed 'be representative of ail the tribes having rights on the reservation (finding 102, supra).
(b) All the members of the council, including the Yurok added to the council to represent that tribe, resided on the Square. A petition 'by the council to the Commissioner, set out in finding 89, supra, showed that despite the directions from the Indian Office the council in fact spoke on 'behalf of Hoopa or Square Indians and in opposition to Yurok or Addition Indians. See also finding 102, last paragraph, supra.
(c) There is no evidence of any activity of this council beyond this brief period.
111. On May 5, 1930, Superintendent John I). Keeley reported to the Commissioner of Indian Affairs that the Hoopa Valley Reservation did not have a tribal council. (The report was made in connection with an application for enrollment, which Keeley thought should be denied, since the man involved had lived off the reservation all his life and did not plan to make his home on the reservation.) Of a council Keeley said that there was none and he was glad of it:
As to putting the case up to the tribal council, this reservation does not have one, for which I am thankful, as tribal councils are the biggest source of agitation of anything in the Indian service. They are usually made up of the hand-picked agitators, and for the most part, the ones who can not, or will not, work or do anything for themselves.
112. Almost at the same time as this letter by Superintendent Keeley was written, Washington was writing to him, suggesting that a pending problem (the refusal of an Indian to do certain irrigation work) he presented to the tribal council. This letter was answered by Keeiey’s successor, O. M. Boggess, on July 24, 1930. Boggess replied that the problem had meantime been solved and, further “we have no tribal council and I doubt the advisability of organizing one.”
113. On January 10,1933, Superintendent Boggess wrote to Commissioner Rhoads that since the time of the visit of a *952 Senate investigating committee to the reservation, “our Indians at Hoopa” had become interested in organizing “a Business Committee or as they call it Tribal Council” which would have between 6 and 12 members “to represent the Hoopas in official matters.” Boggess added he had no objection to this, because some of the “best Indians of the Valley” had been selected for the “Committee.” He further explained that the Committee preferred to represent the Hoopas only, allowing the Klamaths down the river, “who but seldom come to Hoopa,” to form their own council:
Because of the fact that the Indians down the Klamath river but seldom come to Hoopa, and their interests in many cases are different it is understood that they prefer a legally organized body of the Hoopas only; permitting the Klamaths to form a similar organization for their people if they should care to do so.
114. By letter of February 3,1933, Commissioner Rhoads replied that the Indian Office had no objection to the formation of such a tribal council as the Superintendent had proposed. He cautioned, however, that its activities would be advisory only and that in most cases final action would remain in the Department of the Interior. The letter authorized Boggess to call a council of Indians of his jurisdiction to adopt a constitution providing for election of the business committee.
115. In the meantime, on January 23,1933, Boggess wrote again to the Commissioner advising that some of the Indians living along the Klamath River had also formed a business committee to represent the Indians residing along the river. Boggess recommended that since the terrain made it difficult for the Indians along the entire river to meet to elect representatives, this informally created committee should be recognized in “ordinary matters.” He said:
Owing to the exceedingly rough nature of this section and the lack of roads it would be exceedingly difficult to require the Indian people along the entire river to meet together for a regalar election of councilmen, and as the number of matters requiring their attention is but limited I do not think that they would be justified in going to this expense.
*953 I suggest, therefore, that the Office write this body that it is possible that their organization has not been effected in exact 'accordance with its rules in regard to the election of a business committee but that it will be glad to recognize them in all ordinary matters which they wish to present in behalf of the Indians residing along the Klamath.
116. Commissioner Khoads responded on April 20, 1933 that it had been understood that the council proposed in the Superintendent’s first 'letter of January 10 (and already authorized (findings 113,114, supra)) was intended to represent “the various tribes of Indians within the Hoopa Valley jurisdiction” so that it could handle matters affecting all of the “Hoopa Valley Indians.” The Indians along the Klamath, the Commissioner continued, could have a separate committee for “local matters not involving the whole Hoopa Valley jurisdiction,” but, he wrote, matters involving “the whole tribe” should be handled by “the tribal business committee for the whole tribe.” He said:
It was our understanding that the organization proposed in said letter of January 10 was intended to represent the various tribes of Indians within the Hoopa Valley jurisdiction. In this way the business matters affecting all of the Hoopa Valley Indians could, no doubt, be more economically and expeditiously handled.
If the Indians residing along the Klamath River desire to have a separate business committee of their own for local matters not involving the whole Hoopa Valley jurisdiction, this Office has no objection. However, in matters involving the whole tribe, it is believed that they should act through their representatives on the tribal business committee for the whole tribe. We do not see the necessity, however, for selecting more than one representative from each of the eight districts for this organization.
117. When organized, the business committee of the Indians along the Klamath River was advised by Superintendent Boggess that the committee “would have to be through the Hoopa Council and it would only be a sub-council.” The Klamaths were “disappointed that they couldn’t have their own full council,” and the council “died out.” (The quota *954 tions are from testimony of witnesses who recalled that attendance continued for only about a year.)
118. Sometime between February and May, 1933, Superintendent Boggess posted a notice calling for an election of the authorized council, but the response, he felt, was small and not representative, and no election was held at the appointed time. Thereafter, another plan was devised under which one representative was elected from each of a number of districts within the Square.
119. On June 3,1933, seven Indians who had been elected councilmen from districts all of which were in the Square (and who were all residents of the Square) signed a petition to the then newly-appointed Commissioner of Indian Affairs, John Collier, in which they described themselves as “Councilmen of the Hoopa Tribe” and asked approval and recognition of their body as the representative of the “Hoopa Indians” to consider problems “within our boundaries,” the boundaries not being specified. The petition said:
We the undersigned duly elected Councilmen of the Hoopa tribe from the Hoopa Indian Reservation do hereby sincerely petition the Department of the Interior and John Collier, Commissioner of Indian Affairs, to be recognized as the authorized representatives of the Hoopa Indians to transact their business, negotiations and recommendations, to be consulted about expende-tures [sic] and disbursements pertaining to the welfare of our tribe and absolute control of our tribal funds or any disposition of said funds.
We sincerely wish to submit for your approval the organization of this tribe into seven Districts. Each of which have [sic] selected and elected by a majority of votes one Councilman for each district to meet one day each month to consider any problems which may arise within our boundaries.
‡ $ $ $ *
120. On receipt in Washington of the petition, it was passed to the new Commissioner by J. R. Venning of the “Miscellaneous Section” of the Indian Office with a memorandum dated June 14,1933, which, referring to the Department’s letters of February 3 and April 20 (findings 114, 116, supra), *955 said tbait no official report of the organization authorized had been received and that it was “quite probable” that the petition referred to the organization which had been authorized, and, further, that while it looked like a good plan it would be well ito have the constitution and the official report of proceedings before giving recognition.
121. Commissioner Collier thereupon on the following day wrote to Gilbert R. Marshall, secretary-councilman of the council, acknowledging receipt of the petition and requesting that Marshall confer with Boggess and ask him to write to Collier “as to the status of any tribal organization which may now exist at Hoopa.”
122. Boggess was just about then, on June 19, writing to the Commissioner. Referring to the Office’s letter of February 3 “authorizing the Indians of this jurisdiction to organize a tribal business committee” (finding 114, sufra), he asked for recognition of a tribal business committee which had been elected in “each district of the reservation.” The names of the districts were given. To one closely familiar with the neighborhoods in the Square, the names of the districts, all place names in the Square, six of the seven being places in the valley itself, would have disclosed that the electorate of the council was limited to the Square. The letter did not otherwise indicate the scope of the area — Square or entire reservation — or of the Indians to be represented by the committee.
123. On July 10, 1933', Boggess sent the Commissioner a copy of the constitution of “our Business Committee,” with his recommendation that it be approved.
Before the constitution was received, Assistant Commissioner William Zimmerman, Jr., on July 21,1933, responded to Boggess’ letter of June 19, sending him a copy of the council’s petition of June 3 (finding 119, supra), stating that Boggess’ letter of June 19 gave insufficient information and asking for a report as to the organization and the matters taken up. This letter does not indicate that the constitution, mailed by Boggess on July 10, had been received.
124. The “Constitution and By-Laws of the Hoopa Busi *956 ness Council,” (a single document), was sent by Boggess to tbe Commissioner on July 10. It provided as follows:
Article 1. This organization shall be known as tbe Hoopa Business Council.
Article 2. Tbe members of the Business Council shall be elected to act for tbe tribe * * * .
Tbe views of the tribe having been determined, tbe business council shall be cloaked with authority to act in any and all tribal matters, including tribal claims of every nature.
Hi * # *
Article 3. Tbe business council shall be composed of seven enrolled members of tbe Hoopa tribe; bona fled [sic] residents of Humboldt County, California, and twenty-one years of age or over.
* * * # *
Article 18. This constitution shall be in full force and effect to govern the Hoopa tribe and business council on and after the date it is approved by the Commissioner of Indian Affairs at Washington, D.C.
Aside from the quoted references to “the Hoopa tribe,” the constitution did not indicate the geographical scope of the jurisdiction of the council — whether Square or entire reservation, the districts from which the councilmen would be elected, the eligible class of electors, or give any other data which would disclose whether the council was to be representative of or empowered to act concerning the Square alone or the entire reservation.
125. On November 20,1933 Commissioner Collier approved the constitution, in a letter addressed to the secretary of the Hoopa Business Council. The full text of the letter read as follows:
.This will advise that careful consideration has been given to the constitution and by-laws of the Hoopa Business Council submitted some time ago by the superintendent of the Hoopa Valley Indian Agency, and they are hereby approved.
This organization is recognized by this Service as being the official representative body of the Hoopa Valley tribe.
*957 A note at the foot of tlie letter reads “Carbon to Hoopa Valley.”
The Hoopa Business Council — Composition and Operations
126. In July 1934, Superintendent Boggess responded to an Indian Office circular questionnaire on tribal governments on reservations. In answer to the question “Does your council or committee or other organization represent the entire reservation or jurisdiction or are there separate organizations for each tribe” he said that the council represented the Square only:
Represents only the 12 mile square Hoopa proper [sic]. Klamath River, Extension a mile on each side of river from Hoopa reservation to Ocean, not represented on this council.
He confirmed this answer in responding as follows to a question as to the weaknesses of the present tribal government:
Inability to have proper representation from Klamath River portion. Difficulty of travel makes it impracticable for them to attend. Being a separate tribe they are not welcomed by Hoopas on strictly Hoopa matters.
127. The members of the Hoopa Business Council organized pursuant to the constitution and bylaws of 1933 were elected from six districts in the Hoopa Valley proper and one district on Bald Hills near the Valley, all in the Square, by the Indians residing in those districts.
128. Though the constitution of the Hoopa Business Council provided that council members be enrolled members of the Hoopa tribe (finding 124, supra) Indians of Yurok and Karok blood were members for periods of many years. They were David Risling and Jerry Home, residents and allottees of land on the Square; George Nelson and David Masten (the latter is the same “David Maston” as had represented the Klamaths on the 1916 council (finding 102, supra)), both of whom held allotments on the Connecting Strip and were long-time residents on the Square; and Elizabeth Quimby, a long-time resident of the Square.
*958 129o A number of Indians of mixed Yurok and Hoopa blood were members of tbe council. They were Edward Marshall, chairman in 1933-35; Gilbert Marshall, a member during ten years, 1933-35 and 1945-50, and chairman in 1935-37; Julius Marshall, a member for five years, 1935-39; Mahlon Marshall, chairman during five years, 1939-43; James Marshall, a member in 1943-45; Ernest Marshall, a member in 1948-50; Dehnar Colegrove, a member in 1938-39; Gene Colegrove, a member in 1939-40; Byron Nelson, a member in 1948-49 and 1959; and Peter Masten, a member in 1936 and chairman in 1948-50. The Marshalls were half-Hoopa, half-Yurok; the others had varying fractions of Yurok and Hoopa blood*
130. The Hoopa Business Council dealt not only with matters affecting the Square but also received delegations of Indians of the Addition and dealt with matters on or arising from the Addition. These matters, arising over the nineteen-thirties and nineteen-forties, included land disputes, expenditures and recommendations for improvement of roads, irrigation facilities and domestic water arrangements, a mineral lease, licenses for Indian traders and mapping along the Klamath River.
131. The council’s Indian Court, to which it appointed as the reservation’s Indian Judge David Masten, a prominent Yurok Indian (see finding 128, supra), passed upon disputes arising on the Addition as well as those arising on the Square, thereby exercising the same all-reservation jurisdiction as did the council itself.

Yurok amd Addition Organizations

132. The Yurok Tribal Organization, a California corporation, was formed in 1949 to represent and promote the interests of all persons of Yurok ancestry, a group described as native to and resident of the Klamath River Basin, an area larger than the Addition.
133. A Yurok Indian Club is mentioned in the record in two widely-separated years. Nothing is known of its nature or membership.
134. On September 3,1955 a constitution was adopted by a *959 group of Indians, presumably Yuroks of the Connecting Strip, establishing an organization called the “Yurok Extension Business Organization,” whose members would be Yuroks and which would exercise jurisdiction over the un-allotted trust-status lands of the Connecting Strip. The Commissioner refused to approve the organization on the grounds, among others, that the organization would be confused with the “Yurok Tribal Organization” (finding 132, swpra) and that the membership was limited to Yuroks while not all the residents of the area intended to be represented were Yuroks.
135. In 1961, long after the issue in the instant case had arisen, the Government encouraged the formation of a “Hoopa Extension' Reservation Organization,” to exercise jurisdiction over the unallotted trust-status lands on the Connecting Strip. The members of the organization would be allottees on the Connecting Strip, lineal descendants of such allottees, of a specified percentage of Indian blood, and persons who “Should have been” allotted. Despite the support of the Indian Office for the adoption of a constitution (which would have accepted the premise of the Government in the instant case of a separation of the rights of the Addition and Square Indians) the constitution was voted down, 110 to 31, the majority being of the opinion that they had a right to be members of an all-reservation group and intended to use legal means to enforce their rights.
1950 — The Hoopa Valley Tribe, its Hoopa Valley Business Ooumeil and the Official Boll of the Members of the Tribe
136. In 1948, the Hoopa Business Council began formulating a program for the compilation of 'a current roll of the Indians of the Hoopa Valley Reservation as it originally was created, that is, the Square, for the purpose of controlling the revenues from the resources of the reservation as so defined. The discussions at council meetings of the compilation of the proposed roll, as reported in the minutes of the meetings, reflect a, sentiment to exclude from the roll Indians of the Addition.
137. The council approved a form of application for enrollment on the proposed roll, prepared by the chairman and *960 secretary of the council. The form was distributed only in the districts of the council, located in the Square. It was not distributed on the Lower Klamath Strip and the Connecting Strip because it was intended to exclude from enrollment the Indians residing there, unless they could qualify ;as a descendant of an allottee on the Square.
138. The application form was entitled “Application for Enrollment — Hoopa Valley Reservation — as of November 1, 1948.” Inquiry was made on the form only as to the degree of “Hoopa Indian Blood.” The application form inquired as to the applicant’s justification for applying for enrollment, but did not state the basis upon which the applicant’s eligibility for enrollment would be determined.
139. From the Indians who submitted application forms, the Hoopa Business Council prepared a list, entitled Schedule A, of those who had been allotted land on the Square or who were descendants of such allottees, and a list, Schedule B, of eighteen Indians who were not allottees or descendants of allottees on the Square, but were either “true” Hoopa Indians or Indians whom the council felt were entitled to membership in the tribe because their failure to obtain allotments was through no fault of their own.
140. At its meeting on April 6, 1950, the council set an election for May 13, 1950, for the purpose of adopting the schedules which it had prepared as the roll of Indians who would be entitled to share in the revenues from the resources of the original reservation, that is, the Square.
141. A notice was posted, addressed to “The Electors Of The Hoopa Valley Indian Tribe,” that the election on May 13, 1950, would have the following purposes: 1) “To determine the minimum degree of Indian blood which a member of the Hoopa Tribe must have to be eligible for Tribal enrollment in the future2) “To adopt a new Constitution and Bylaws for the Tribe;” 3) “To adopt officially into the Hoopa Tribe that certain list, designated as Schedule A, of Hoopa allottees and their descendants, to enable them to share in Hoopa Tribal benefits and moneys;” and 4) “To adopt officially into the Hoopa Tribe that certain *961 list, to be designated as Schedule B, of Indians and their descendants who were not given allotments to enable them to share in Hoopa Tribal benefits and moneys.”
The council had stated that persons at least twenty-one years of age, who had made application for enrollment, could be eligible to vote. The notice stated that the electors entitled to vote at the election must foe not less than twenty-one years of age and must be on that list of Indians who made application for enrollment into the “Hoopa Tribe” prior to October 1,1949, and that the list could be seen at the office of the Hoopa Indian Sub-Agency.
142. The “Hoopa allottees and their descendants” referred to in the foregoing notice to electors were the living allottees on the Square and their living descendants who had made application for enrollment and had been placed on Schedule A by the Hoopa Business Council. The Indians on Schedule B were the eighteen Indians placed on the schedule by the Hoopa Business Council and were stated to be “either true Hoopa Indians” or to be entitled to membership in the tribe “since their failure to obtain allotments was through no fault of their own.” The Indians on the list of Indians who made application for enrollment into the Hoopa Tribe prior to October 1, 1949, who the notice stated to be the electors entitled to vote, were not all of the Indians who had made application for enrollment. Bather, the Indians on this list, which the notice stated could be seen at the office of the Hoopa Indian Sub-Agency, were those Indians who had applied for enrollment and who the Hoopa Business Council had found to be allottees or descendants of allottees on the Square. Thus, the Indians on the list of electors and the Indians on the Schedule A to be voted upon were the same.
143. The electors were not representative of the Indians of the entire Hoopa Valley Keservation in that they did not include (a) Yurok or other non-“true”-Hoopa non-allotted Indians of the reservation, primarily Indians of the Addition, who were not descendants of allottees on the Square, and their descendants; and (b) Indians who had been allotted on the Addition, and their descendants.
144. At the election, held on May 13, 1950, 106 persons *962 voting, tlie proposed constitution and bylaws was adopted by a vote of 68 to 33.
145. Tbe constitution and bylaws adopted on May 13,1950 established an organization denominated the “Hoopa Valley Tribe.” The membership of this organization is described in Article IV of the constitution as follows:
Section 1. The membership of the Hoopa Valley Tribe shall consist as follows:
(a) All persons of the Hoopa Indian blood whose names appear on the official roll of the Hoopa Valley Tribe as of October 1, 1949, provided that corrections may be made in the said roll by the Business Council within five years from the adoption and approval of this Constitution, subject to the approval of the Secretary of the Interior or his authorized representative.
(b) All children born to members of the Hoopa Valley Tribe who are at least one-quarter degree Indian blood.
Section 2. The Business Council shall have the power to make rules governing the adoption of new members or the termination of membership in the tribe.
146. The constitution and bylaws of May 13, 1950 created an executive body called the Hoopa Valley Business Council and conferred upon the council authority to direct the distribution of the resources of the Square, in addition to the authority (preceding finding) to make the rules governing membership in the “Hoopa Valley Tribe.” The assumption of power over the Square was accomplished by Article III, Territory, which provided that the jurisdiction of the Hoopa Valley Tribe should extend to the Hoopa Valley Reservation as established by executive order in 1876, that is, the Square:
The jurisdiction of the Hoopa Valley Tribe shall extend to all lands within the confines of the Hoopa Valley Reservation boundaries as established by Executive Order of June 23,1876, and to such other lands as may hereafter be acquired by or for the Hoopa Valley Indians of‘California.
147. Schedules A and B, the tribal roll (findings 139-40, supra) were also adopted at the election held on May 13, 1950. Schedule A was adopted by a vote of 17 to 16. The adoption into the tribe of each of the 18 persons on Schedule B was approved by varying maj orities.
*963 148. Residence on the Hoopa Valley Reservation was not a requirement for inclusion on 'Schedule A, the list of al-lottees and their descendants. “Many” (the word of the Government’s District Agent in forwarding the official roll for approval) of the persons on Schedule A were not then residents of the Hoopa Valley Reservation.
149. In June, 1950, a Hoopa Valley Business Council was elected, as provided in the constitution and bylaws.
150. The Hoopa Valley Business Council, although its jurisdiction was by the constitution limited to the Square (finding 146, supra) acted upon matters in the other parts of the reservation, as had its predecessor, the Hoopa Business Council (finding 130, supra), such as approvals of land selections outside the Square and a right of way for a road outside the Square.
151. On February 1,1951, the Director of the Sacramento Area Office of the Bureau of Indian Affairs advised the Superintendent of the Hoopa Valley Reservation that the Indians of the Klamath Strip should be represented on the Hoopa Valley Business Council, as follows:
‡ $
It is our opinion that the title status of the main portion of the Hoopa Valley Reservation and that of the Klamath River Strip extending downstream approximately 20 miles from this area is exactly the same, therefore any funds derived from the resources of the Kla-math River Strip area should be accredited to the Indians of the Hoopa Valley Reservation. The Indians of the so-called Klamath Strip are, in our opinion, members of the Hoopa Valley Reservation.
We agree with your thought in the second paragraph of your letter that the Indians in the so-called Klamath Strip should have representation on the Hoopa Business Council.
We do not have any contemplated timber sales in this area at the present time, although, as you know, there have been several requests for such sales.
152. (a) On December 6,1951, the Hoopa Valley Business Council appointed a committee to formulate a plan for the enrollment of additional Indians with the Hoopa Valley Tribe on a “C” Roll.
(b) The “C” Roll committee submitted a report at the *964 March 28, 1952, meeting of the council with a request that the council fix the period of residence on the Hoopa Valley Reservation that would 'be required for enrollment on the “C” Roll.
(c) A year later, on April 2,1953, the council established requirements for enrollment on the “C” Roll and set June 2, 1953, as the deadline for the acceptance of applications. These requirements were that an applicant must have resided in Hoopa for a period of 15 years, must 'have had forebears bom on a ranchero on the Square; and must be of at least one-quarter Hoopa blood. On June 10, 1954, the council adopted a resolution declaring eighteen applicants for enrollment on the “C” Roll to be members of the Hoopa Valley Tribe.
153. On March 25, 1952, the Commissioner of Indian Affairs approved Schedules A and B, Which had been adopted May 13, 1950 (finding 147, sufra) and on September 4, 1952, he approved the constitution, with certain exceptions (withholding approval of a tribal court and requiring that the function of approval of the actions of the council be lodged in the Area Director rather than the Commissioner).
154. By letter dated September 4,1952, the Commissioner advised the Chairman of the Hoopa Valley Business Council that: “There is no objection to the operation of tribal business in accordance with the Constitution and Bylaws adopted by the Hoopa Valley Indians in a referendum held on May 13, 1950, until such time as this office and the Hoopa Valley Indians can establish suitable organization under provision of the laws of the 'State of California * *
155. On November 6, 1959, the Hoopa Valley Business Council adopted the following resolution defining the criteria Which it had employed 6 years earlier in compiling the “C” Roll and purporting to clarify the criteria employed by the former Hoopa Business Council in compiling, some 10 years earlier, Schedules A and B, the so-called “Official Roll of the Hoopa Valley Tribe as of October 1, 1949,” as follows:
Whereas: The absence of written rules and procedures to explain the composition of the “Official Roll of the Hoopa Valley Tribe as of October 1, 1949,” also cor *965 rections thereto, has been conducive to various interpretations of eligibility requirements, and,
Whereas: Lack of consistent actions in the determination of eligibility of applicants has resulted in charges that the Business Council has not acted in strict accordance with the Constitution and Bylaws of the Hoopa Valley Tribe, and,
Whereas: There is need for an accurate and complete membership roll to be used in conjunction with the allotment program desired by the Hoopa Valley Tribe.
Now therefore be it resolved: That the following definitions accurately describe the procedures followed and clarify the intent not heretofore expressed in the ■membership requirements as set forth in Article 4 of the Constitution and Bylaws of the Hoopa Valley Tribe approved September 4,1952:
Definitions
1. Hoopa Valley Tribe
The Hoopa Valley Tribe consists of remnants of the Hunstang, Hupa, Miskut, Bedwood, Salaz, Sermal-ton, and Tish-tang-atan Bands of Indians residing within the twelve-mile square reservation created June 23, 1876, and their descendants.
2. Official Boll of the Hoopa Valley Tribe as of October 1,1949
“The Official Boll of the Hoopa Valley Tribe as of October 1, 1949” consists of Schedule A captioned “Official Boll as of October 1, 1949, of Members of the Hoopa Valley Tribe Who May Participate in Tribal Benefits and Moneys” and Schedule B captioned “Addition to the Official Boll of Members of the Hoopa Valley Tribe Who May Participate in Tribal Benefits and Moneys” both schedules being approved at a general election on May 13,1950, and approved by the Commissioner of Indian Affairs on March 25, 1952. Approval of the Schedule B applicants was given by voting on the 18 individuals named on the list.
3. Schedule A.
Schedule A consists of allottees living on October 1, 1949, whose names appear on the J. B. Mortsolf original allotment schedule for the Hoopa Valley Beservation approved March 2, 1922, and descendants of such al-lottees living on October 1, 1941.
*966 4. Schedule B.
Schedule B consists of applicants living as of October 1, 1949, and filing at the same time as applicants who were included on Schedule A, whose residence within the twelve-mile square area of the Hoopa Valley was not subject to question, who although eligible to have received allotments were never allotted but who were generally considered as members of the Hoopa Valley Tribe and permitted to participate in Tribal Affairs, and their descendants living on October 1,1949.
•5. Corrections.
Corrections to the Official Boll of the Hoopa Valley Tribe as of October 1,1949 were authorized under Article 4, Section 1(2) during a period of five (5) years ending September 4, 1957. Such corrections applied to: “Persons bom not later than October 1, 1949, who qualified by the same requirements as met by persons on either Schedule A or Schedule B comprising the October 1, 1949 roll, whose applications were filed within the five year period ending September 4, 1957.”
6. Schedule C.
Pursuant to authorization contained in Article 4, Section 2 of the Constitution and Bylaws a schedule C application procedure was devised. A Schedule C applicant was required to have resided within the Hoopa Valley Beservation for a minimum of 15 years, to have had fore-bearers bom within the twelve-mile square Hoopa Valley Beservation, to have had at least 1/4 degree Hoopa blood or have been a legally adopted child having at least 1/4 degree Indian blood and to have filed an application within a sixty(60) day period ending June 2,1953.
7. Children.
“Children” as used in Article 4, Section 1 (b) is restricted to persons born after October 1,1949.

Procedures

The C Schedule established certain specific requirements to be met by those persons who were ineligible for enrollment under the requirements of Schedule A and Schedule B. Eligibility was determined on an individual basis and did not automatically pass from a parent to a child bom prior to October 1, 1949. However, once an individual was approved for membership as a C Sched *967 ule applicant, he acquired the same rights and privileges as other enrolled members.
156. The following month, on December 11, 1959, the Hoopa Valley Business Council adopted a resolution amending the resolution of November 6,1959, purporting again to clarify the criteria employed by the former Hoopa Business Council in compiling Schedule A, which with Schedule B comprised the so-called “Official Boll of the Hoopa Valley Tribe as of October 1,1949”. This resolution amended definitions 2 and 3 of the prior resolution (preceding finding) to read as follows :
2. Official Boll of the Hoopa Valley Tribe as of October 1, 1949.
The Official Boll of the Hoopa Valley Tribe as of October 1, 1949 consists of Schedule A and Schedule B, as herein defined, both schedules being approved at a_ general election on May 13, 1950, and by the Commissioner of Indian Affairs on March 25, 1952.
3. Schedule A.
Schedule A consists of allottees living on October 1, 1949, and descendants of allottees living on October 1, 1949.
1917-1958 — Proceeds of the Sale of the Lands of the Old Klamath River Reservation
157. The 1892 act which provided for the sale of the lands of the Klamath Biver Beservation (finding 77, supra) provided, also, that the proceeds of the public sale of lands were to be a fund used by the Secretary of the Interior for the “maintenance 'and education” of the resident Indians. In 1917 the statute was amended to add to these purposes “the pro rata improvement of individual Indian allotments” and “the construction of roads, trails, and other improvements for their benefit.” Act of March 2,1917, 39 Stat. 969, 976.
.158. The proceeds of the public sale of lands of the old Klamath Biver Beservation were held in a Treasury account entitled “Proceeds of Klamath Biver Beservation,” and interest on the sums therein was credited to an interest account with the same name.
*968 159. In 1918 a road costing approximately $16,000 was built through the 'area of the old Klamath River Reservation with the use of funds from .the account “Proceeds of Klamath River Reservation.” While the work was under way, Congress enacted general legislation that tribal funds could be spent only pursuant to a specific appropriation. Sec. 27, Act of May 18,1916, 89 Stat. 128,158. Thereafter $3,215.12 was expended by the Superintendent to complete the road, without such an appropriation. In 1920 Congress, after the fact, authorized payment of this sum in the Act of February 14,1920, 41 Stat. 408,418, as follows:
That the Secretary of the Interior and the Secretary of the Treasury be, and they are hereby, authorized to allow payment of an indebtedness amounting to $3,215.12 incurred by the Superintendent of Hoopa Valley Agency, California, during July, August, and September, 1918, in the construction of a trail on the Klamath River Reservation, from the tribal fund known as “Proceeds of Kla-math River Reservation, California,” which was made available for that and other purposes by the Act of March 2, 1917 (Thirty-ninth Statutes at Large, page. 976), but from which no expenditures were authorized by section 27 of the Act of May 25,1918 (Fortieth Statutes at Large, page 591.)
160. On December 31, 1942 Superintendent Boggess requested authorization of an expenditure of $200 from “the tribal fund of the Lower Klamath Indians” (by which he apparently meant the account “Proceeds of Klamath River Reservation”) , as distinguished from what he characterized as the “tribal fund of the Hoopa Valley Indians” (by which he presumably meant the all-reservation fond in the account “Proceeds of Labor, Hoopa Valley Indians,” finding 167, infra), for the expenses of a visit by a committee of Lower Klamath Indians to the State legislature to seek a bill reimbursing the Indians for losses by a closing of the river to fishing in 1933.
161. As of March 19, 1947 there was $5,107.35 in the ac *969 count “Proceeds of Klamath River Reservation” and $3,204.10 in the parallel interest account.
162. On March 19,1947 the Superintendent reported with his recommendation for approval a “request from the tribal council of this area” for an allotment of $300 from the interest account to pay the costs of a trip to Sacramento in re the “Claims of California Indians.” (There was no such council. The record shows only a resolution requesting such an allotment, passed 25 to 0 “[a]t a meeting of the Yurok Indians of the lower Klamath River held at Klamath California on March 23,1947.”)
163. A letter from the Sacramento Area Office of the Bureau of Indian Affairs dated February 3, 1954 addressed to the secretary of the “Yurok Tribal Organization” (finding 132, supra), stated that the office had been allotted $1,000.00 of “Yurok Tribal funds,” presumably funds in the account “Proceeds of Klamath River Reservation” for the program submitted by the secretary, including travel expenses of tribal delegates.
164. On September 19, 1934, by Department order in the Department of the Interior, such of the land on the former Klamath River Reservation as had been opened for public settlement under the provisions of the Act of June 17, 1892, (finding 77, supra) but which had not been settled upon, was withdrawn from disposition pending possible restoration to tribal ownership. By a subsequent order on November 5, 1935, this land was continued in a state of withdrawal.
165. The withdrawal from sale of unsold lands of the former Klamath River Reservation (preceding finding) was made permanent in 1958. The Act of May 19,1958, 72 Stat. 121, provided for the restoration of tribal ownership of 159.57 acres of land on the reservation at Klamath River, California and of other, larger tracts on other reservations. Title to “the lands restored to tribal ownership” was to be in the United States in trust for “the respective tribe or tribes” and the various tracts were “added to and made a part of the existing reservations for such tribe or tribes.”
*970 1955 — Payment ~by the Government of the Income from the Square Exclusively to Persons on the Official Boll of the Hoopa Valley Tribe
166. In 1951, the Sacramento Area Director of the Bureau of Indian Affairs (apparently ¡the Commissioner’s delegate in such matters (see finding 153, supra)) advised that any funds derived from the resources of the Klamath River Strip area of the reservation should be credited to the account of the Indians of the Hoopa Valley Reservation. His letter is quoted in finding 151, supra.
167. Until 1955, any revenues from both parts of the Hoopa Valley Reservation — the Square 'and the Addition — were deposited in a single United States Treasury Account, No. 14X7236, entitled “Proceeds of Labor, Hoopa Valley Indians.” The interest derived from the funds in this account was credited to United States Treasury Account No. 14X7736, entitled “Interest on Proceeds of Labor, Hoopa Valley Indians.” Disbursements were made from these accounts for improvements on all parts of the reservation.
168. Although all the revenues from the reservation went into one account (preceding finding), Superintendent Bog-gess seems to have sought to relate the benefits from expenditures to the place of the source of the funds being expended. Thus, at a time in 1938 when the total revenues in Account No. 14X7236 derived from outside the Square were $2,511.45, of which $2,263.:80 had been derived from a contract with a lumber company to cut timber at Johnson’s Village on the Connecting Strip, Superintendent Boggess planned to spend only $2,263.80 for water developments at Johnson’s Village, as “the amount received from the sale of cedar in that locality,” though the appropriation for the water development at Johnson’s Village was $2,500.00. Actually, additional sums of $187.70 and $53.04 in the account had also been derived from the cutting of timber on unallotted trust-status tribal land at Johnson’s Village.
169. On April 23, 1954 the Area Director of the Indian Bureau at Sacramento requested the establishment of an ac *971 count for depositing “receipts to the credit of the Yurok Indians of California.” The response of the Fiscal Section, dated April 29, 1954 listed five reservations in which “different groups of Yurok Indians resided”; on the list were “Hoopa Valley Keservation” and “Klamath River Reservation.” On July 1,1954 the Director of the Division of Budget and Finance in the Office of the Secretary requested the Treasury to establish two accounts as follows:
147153 Deposits, Proceeds of Labor, Yurok Indians of Lower Klamath River, California.
147154 Deposits, Proceeds of Labor, Yurok Indians of Upper Klamath River, California.
Trust fund receipt, appropriation and interest accounts were opened, one each for the “Yurok Indians of Lower Klamath River,” all ending in the number 53, and one each for the “Yurok Indians of Upper Klamath River,” all ending in the number 54.
170. Commencing in 1955, revenues derived from the resources of the Connecting Strip were credited to Account No. 14X7154, “Proceeds of Labor, Yurok Indians of Upper Klamath River, California” and revenues derived from the resources of the Lower Klamath River strip were credited to Account No. 14X7153, “Proceeds of Labor, Yurok Indians of Lower Klamath River, California.” As of 1969 approximately $72,070 had been credited to Account No. 14X7154, and $3,956 to Account 14X7153. Revenues derived from the resources of the Square continued, as before, to be credited to the accounts for the benefit of the “Hoopa Valley Indians” ('finding 167, supra). The major portion of these revenues has been from timber sales.
171. Beginning in 1955 and continuing to the present time, the Secretary of the Interior, upon requests made by resolutions of the Hoopa Valley Business Council, has each year disbursed, from the accumulated income in Account No. 14X7236 and its interest Account No. 7736 for the Hoopa Valley Indians (finding 167, supra), per capita payments to the Indians on the official roll of the Hoopa Valley Tribe or *972 ganized pursuant to the constitution and bylaws adopted at the election of May 13, 1950 (findings 136 et seq., supra).
172. The total of the per capita payments through February 1969 was $12,657,666.50. The payments were made at the following times and in the following amounts:
Payment period Total amt. each Amt. paid each payment indiv.
#1 Jan 1955... $76,600 $100
Suppl. Aug 1955.... 1,600
Suppl. Apr 1955. 1,900
#2 Sept 1955.-. $168,600 $200
Suppl. Deo 1955...... 10,600
#3 Jan 1956. $256,600 $300
Suppl. Jan 1957. 3,600
#4 Oct 1956. $178,600 $200
#5 Apr 1958. $277,600 $300
Suppl. Mar 1959..... 4,200
Suppl. Apr 1959....... 300
#6 Deo 1958. $265,100 $276
#7 Apr 1959. $261,630 $270
Suppl. Aug 1959. 270
#8 Deo 1959... $276,942 $281
#9 Apr 1980. $275,931 $279
#10 Deo 1960. $468,304 $448
#11 Apr 1961.-. $469,096 $444
#12 Deo 1961. $382,320 $360
Suppl. Apr 1962. 720
Suppl. June 1962_____ 1,800
#13 Apr 1962. $381,625 $365
Suppl. June 1962. 1,775
Suppl. Apr 1962....... 1,420
#14 Deo 1962. $479,600 $436
#15 Apr 1963. $480,630 $433
#16 Deo 1963. $703,425 $622.50
#17 Apr 1964....... $703,700 $620
#18 Deo 1964. $625,240 $539
#19 Feb 1965. $625,937 $541
#20 Deo 1965.... $604,237. SO $512. SO
#21 Apr 1966. $605,696 $512
#22 June 1966..... $696,000 $600
#23 Deo 1966. $534,600 $445.50
#24 Mar 1967. $534,417.50 $443.50
#25 Oot 1967. $233,530 $193
#26 Nov 1967-.-. $233,530 $193
#27 Fob 1968... $233,593 $191
#28 June 1968. $233,593 $191
#29 Aug 1968-. $465,129 $374.50
#30 Nov 1968. $465,129 $374.50
#31 Feb 1969. $464,746.50 $371.50
$12,657,666.50' $11,405.50
*973 173. The Secretary of the Interior has refused and has continued to refuse to distribute any income derived from the Square portion of the Hoopa Valley Eeservation to any Indians of the Hoopa Valley Eeservation other than those who are members of the Hoopa Valley Tribe according to its official roll.
174. In 1958 the Deputy Solicitor of the Department of the Interior ruled that “no Indians other than those enrolled as members of the Hoopa Tribe of the original 12-mile square reservation and their descendants, have rights of participation in the communal property on that part of the Hoopa Valley Eeservation.” 65 Dec. Dept. Int. 59, 68 (1958). Making no reference to the presence of Klamaths on the Square, he held that the Hoopas had exercised jurisdiction over the Square from earliest times and that their rights were vested by 1891. The executive order of that year he held to have been merely “an aid to the administration of these, two separated areas” and as making the former Klamath Eiver Eeservation and the Connecting Strip a part of the enlarged Hoopa Valley Eeservation only “technically.” 65 Dec. Dept. Int. at 63,64.
The Government does not in the instant case contend either that this opinion has any binding force or that it is correct in its facts. The opinion does not reflect the facts set out in these findings, primarily the presence of Klamaths on the Square from aboriginal times continuously to 1891 and beyond; moreover, it contains errors of commission and omission, among them the impression given throughout that the Hoopas were the sole occupants of the Square, from the time before the first location of the reservation in Hoopa Valley; that the tribal council on the Square was a permanent institution from 1916 (65 Dec. Dept. Int. at 62; compare findings 109-112, supra); the impression given that Chief Clerk Hauke’s letter of July 17, 1916, was an approving response to the council’s letter of June 19, 1916 (65 Dec. Dept. Int. at 66; see finding 102, supra); and the statement that the allotments approved on the Square were submitted by the Hoopa Tribal Council (65 Dec. Dept. Int. at 67; compare findings 86-97, supra).

*974
Ultimate Findings and Conclusions on the Common Issue of the Exclusive Bights of the Hoopas in the Square

175. Under the Act of April 8,1864, authorizing the President to set apart and locate not more than four reservations in California, at least one to he in the northern district, of such size as he found suitable, for the accommodation of the Indians of California, without specification of the tribes to be so accommodated, the President had discretion to authorize any Indian tribes of California to reside upon such reservations as he set apart. No Indian tribe resident upon a reservation created under the act could obtain vested rights to the exclusion of another group or tribe of Indians thereafter authorized by the President to share in the benefits of the reservation. Healing v. Jones, 210 F. Supp. 125, 138, 153, 170 (D. Ariz. 1962), aff’d 373 U.S. 758 (1963); Healing v. Jones, 174 F. Supp. 211, 216 (D. Ariz. 1959); Crow Nation v. United States, 81 Ct. Cl 238, 278 (1935).
176. Superintendent Wiley’s public notices of August 21, 1864 and February 18,1865 (findings 13, 21, supra) locating the Hoopa Valley Reservation on the tract thereafter called the Square, were issued pursuant to the authority of the act of 1864 and subject to Presidential approval and, having made no mention of any Indian tribe, provisionally established the reservation for such Indians or tribes as might be settled or reside upon it with Presidential authority.
No tribe settled upon or residing upon the reservation pursuant to the notices could, in view of the grant of discretionary authority by the act of 1864 to the President, obtain vested rights in the Square to the exclusion of another group or tribe of Indians thereafter authorized by the President to share in the benefits of the reservation.
177. The so-called “treaty” made at Hoopa Valley in 1864 (finding 15, supra), said to be the source of the Hoopas’ rights in the Square, is concededly not a binding treaty in the constitutional sense. An agreement by an executive officer could not foreclose the President’s authority under the act of 1864 to establish a reservation for such Indians as might be settled there with his approval, and thereafter to enlarge *975 the reservation for the common benefit of the Indians of the added lands and of the original reservation.
178. Any rights to Hoopa Valley given by the treaty to the Hoopas were given equally to other tribes as well, including the Klamaths. The treaty was either made with a number of tribes including the Klamaths or the Klamaths became entitled to its benefits, in accordance with Section 1, Article 1 of its text (finding 15, supra), when they laid down their arms and lived in peace with the Government, or both.
179. The Hoopas were not the sole occupants of the Square, either in aboriginal times or thereafter. While the Hoopa Valley was the native territory of the Hotopa Indians, there were native villages of the Yuroks on the Square, in the canyon north of the valley proper, near the junction of the Trinity with the Klamath River, and nearby at a small distance from the river. At about the time of the aforesaid notices by Superintendent Wiley and thereafter, the residents of the valley included at least Hoopa, Klamath, and Redwood or Chilula Indians.
180. The evidence is abundant that the reservation was intended, from the outset, for the accommodation of numbers of tribes of Northern California, including the Klamaths, such as might reside there with Presidential approval, and that Wiley, his successor and the officers of the Indian Office throughout recognized the rightful presence on the Square of a number of tribes (until the opinion of the Deputy Solicitor, in 1958 (finding 174, supra), approving the action of the Secretary of the Interior complained of in this case).
181. President Grant’s order of June 23,1876, establishing the Hoopa Valley Reservation “as one of the Indian reservations authorized to be set apart in California by act of Congress approved April 8,1864” (finding 29, supra), established the reservation not for any specific tribe or tribes, none having been mentioned in the order, but for such tribes as might reside or settle there, then or thereafter, with the approval of the President, and the tribes as were then resident upon it were subject to further exercise of Presidential authority under the act with respect to the reservation.
182. The residents of the reservation at the time of Presi- *976 tier Grant’s order included Hoopas, Klamaths, Saiaz and Eedwoods. Still others (besides bands or sub-groups of Hoopas) had been settled there between 1864 and 1876, but have not been identified as remaining there in 1876.
183. President Harrison’s order of October 16,1891 (finding 33, supra), extending the boundaries of the Hoopa Valley Eeservation to include the former Klamath Eiver Eeservation and the connecting strip of land between the two reservations, was a lawful exercise of the President’s “continuing authority” under the act of 1864, and “large discretion about exercising it,” “to alter and enlarge the [reservation] from time to time in the light of experience.” Donnelly v. United States, 228 U.S. 243, 256-57 (1913).
The words of the executive order “extended” the “limits” of the Hoopa Valley Eeservation, “a reservation duly set apart for Indian purposes, as one of the Indian reservations authorized to be set apart * * * by Act of Congress approved April 8, 1864” “so as to include” the Addition, with the proviso that tracts to which valid rights had attached under the laws of the United States were “excluded from the reservation as hereby extended.”
The plain and natural effect of the order was to create an enlarged reservation in which the Indians of the original reservation and the Indians of the added tracts would have equal rights in common. Cf. Halbert v. United States, 283 U.S. 753 (1931); Quinaielt v. United States, 102 Ct. Cl. 822 (1945). In extending the boundaries of the Square to include the Addition, peopled by Yurok Indians of Northern California, the executive order was patently carrying out the purpose of the act of 1864 to provide a reservation or reservations in the northern district of California for the accommodation of the Indian tribes of the region.
184. An exhaustive study of the background of the executive order of 1891 and of the legislative origins of the Act of June 17,1892 (27 Stat. 52), providing for allotment and sale of the Klamath Eiver Eeservation, shows no sign of a plan, intention or understanding, executive or Congressional, such as is claimed by defendant to have existed, that the executive order of 1891 should join the Klamath Eiver Eeservation and *977 the Connecting Strip to the Square for administrative or “technical” purposes only — as separate reservations without effect on the substantive rights of the Indians of the Square, or otherwise than as a single, integrated reservation in which all the Indians of the reservation as enlarged should have equal substantive rights. The intention defendant contends for is not once articulated in the voluminous history. No fact in the history, moreover, supports the assertion that the executive order was intended for convenience in administration only and without effect on substantive rights.
185. It quite clearly appears that the intended purpose of the executive order was to accomplish just such an enlargement of the Hoopa Valley Reservation as would bring about a single, enlarged, integrated reservation, effective upon substantive rights.
Soon before the issuance of the executive order, the courts had held that the Klamath River Reservation had been abandoned as a reservation and had accordingly refused to punish white traders who entered the reservation area. Also, bills were steadily being proposed to Congress for the public entry and sale of the lands of the Klamath River Reservation. Some of these bills forbade allotment of lands thereon to the Indians as their homes and directed the removal of the resident Indians to the Hoopa Valley Reservation. The Department of the Interior opposed these bills unless they were amended to permit allotment. The Department had two objectives in mind — to allot lands in severalty to the Indians of the Klamath River Reservation and of the Connecting Strip (together constituting what became the Addition), and to expel traders from the Klamath River Reservation. Reservation status for the Addition would achieve both objectives. Only the incorporation of the Klamath River Reservation into an existing reservation would do, for the maximum of four reservations authorized by the act of 1864 had already been created. Incorporation of the Klamath River Reservation and the Connecting Strip into the adjoining Hoopa Valley Reservation was the natural solution; it had been recommended and considered for years before.
Joinder of the Klamath River Reservation to thé Hoopa *978 Valley Reservation for administrative purposes only or for less than all purposes would have jeopardized the achievement of the desired objective, in view of the necessity that the executive action pass muster with both courts and Congress, which were both already of the view that Klamath River Reservation had been abandoned, for failure of the executive to incorporate it into one of the four existing reservations. As for the Connecting Strip, it had never had reservation status, and it could not get such status by a joinder to the Hoopa Valley Reservation “for administrative puposes only” but only by an incorporation, for all purposes, into a lawful reservation. No limitation whatsoever was, therefore, intended or imposed on the natural legal consequence of the incorporation of the Addition into the reservation.
The intention to affect substantive rights is confirmed by the explicit exception, in the text of the executive order (finding 33, supra), “from the reservation as hereby extended,” of any tract within the Addition to which valid rights under the laws of the United States had already attached. All else was to become part and parcel of the Hoopa Valley Reservation.
The materials cited by defendant do not prove, as claimed, that Congress understood the executive order otherwise or that Congress understood that the reservation was enlarged in such a manner as not to affect the common rights of the Indians of the enlarged reservation in the communal property of all parts of the reservation.
Almost immediately following the executive order, Congress on June 17, 1892 enacted a bill for the allotment of lands on the Klamath River Reservation, to be followed by the public sale of the remaining land, the proceeds of sale to be ia fund for the benefit of the Indians of the reservation (finding 77, supra). Bills of this nature had been considered for many years on the premise that the Klamath River Reservation was abandoned (see findings 50-77, supra); the proponents were not about to make their cause less attractive by amending the mame of the reservation to be sold to call it the “former Klamath River Reservation, now part of the Hoopa Valley Reservation.” Therefore neither the apparent dis *979 regard in the 'bill of tbe effect of the 1891 executive order on the Klamath Kiver Keservation (perhaps in fact an ignorance of the issuance of the executive order) nor the continued existence of the fund of the proceeds of sale for the benefit of the Indians of the “Klamath River Reservation” tends to show any such Congressional understanding of the executive order as defendant contends for, or, indeed, a Congressional understanding of any kind concerning the executive order. The fact is that the act of 1892, the administration over the years of the fund created by the act and the more recent legislative and executive postscript dealings with the “Klamath Kiver Keservation” (findings 157-165, supra) were not intended or understood by their draftsmen and makers to have any bearing on the rights of the residents of the Hoopa Valley Keservation as extended by the 1891 executive order. Those men simply did not have the Hoopa Valley Keservation in mind (see finding 77, supra); there was no need that they should.
186. The highly complex program for allotments on the Hoopa Valley Reservation which extended from about 1890 to 1930 (findings 78-100, supra), too, shows no trace of such a plan, intention or understanding as defendant claims underlay the executive order of 1891. The references to the separate parts of the reservation, in the texts of the instructions to the allotting agents, were simple matters of convenient naming of the three areas of the reservation to be allotted and are wholly immaterial to show a division of the reservation into separate parts for substantive purposes. The restriction of allotments on the Lower Klamath Strip to residents of the Old Klamath Kiver Keservation was the requirement of the act of 1892 (finding 77, supra), providing for allotments on that reservation before public sale, reinforced by the provisions of the General Allotment Act of 1887 (finding 59, supra). When the question arose of the rights of Indians of the Addition to allotment on the Square, under the executive order of 1891, the Commissioner in 1933 ruled that all Indians of the reservation, Addition and Square, were equally entitled to allotment on the Square (finding 96, supra).
The allotment program was marked by other administra *980 tive rulings as well, by bigb and low ranking officials, confirmatory of plaintiffs’ position herein. See findings 101-108, sufra. A notable such ruling was made by Chief Clerk H auke in 1916 when he gave the opinion (finding 102, supra) that not the Hoopas alone but a number of tribes including the Klamaths were entitled to recognition as Indians of the reservation and, therefore, to enrollment upon the reservation and, ultimately, to allotment.
187. The facts of the organizations of Indians on the reservation, prior to the organization of the Hoopa Valley Tribe in 1950 to claim exclusive rights to the Square, are inconclusive and therefore immaterial on the issue presented. The ad hoc tribal council of 1916 was directed by the Indian Office to be representative of all the tribes on the reservation, including Klamaths, but in fact the council was composed of residents of the Square and though it contained a Klamath among its members unanimously petitioned Washington to exclude Klamaths from eligibility to allotment on the Square. The tribal council created in 1933 was ordered by one Commissioner to be representative of all the tribes on the reservation, but his successor (unknowingly, on the proof here made) approved a council representative of the Square only. And that council proceeded to exercise jurisdiction, both legislative and judicial, over the entire reservation, Square and Addition. Though the council was representative of the Square or the “Hoopa tribe” only, for years at a time Yuroks were its members and chairmen. Even the council’s Indian judge, who heard cases arising all over the reservation, was a Yurok (who had been allotted on the Connecting Strip and was a resident of the Square).
188. Nothing appearing to the contrary, and a great deal appearing in support, it is concluded that the effect of the executive order of 1891 was that all the Indians of the reservation as thereby extended — Addition and Square — got equal rights in the enlarged reservation and thus that the rights of Indians of the Addition are equal to those of the Indians of the Square, the Hoopa Valley Tribe or any other Indians of the reservation.
189. It follows that defendant acted arbitrarily in recog- *981 Tilling; only the persons on the official roll of the Hoopa Valley Tribe, whose rales exclude from membership most of the Indians of the Addition, as the persons entitled to the income from the unallotted trust-status lands on the Square. Such of the plaintiffs as are found herein to be Indians of the reservation will become entitled to share in the income from the entire reservation, including the Square, equally with all other such Indians, including the Indians of the Square.

Findings on the Individual Plaintiffs

190. The data in this finding were used in determining whether the residences and birthplaces of the individual plaintiffs were on or off the reservation. The data did not clarify all the cases and in the further proceedings it should be made clearly to appear whether birthplaces and residences are located on or off the reservation.
Villages of the reservation are:

Lower Klamath Strip:

Eequa or Kekwoi
Klamath
Hoppaw or Hopau
Waukel or Wohkel
Scaath
Turwar or Terwer
Starwein Flat
Suppur, Serper or Surpur

Connecting Strip:

Johnson’s Village orWauteck
Cautep or Kotep
Pecwan or Pakwan
Yocktar or Yockta — Donley’s Prairie
Schragoine or Surgone, Seragoine, Sregon
Mettah or Meta
Natchka or Natchko
Moreck or Murek
Cappell or Kepel
Waase or Waasa or Whusi
Mareep or Merip
Kanick or Kenek
Waseck, Wahsek or Waseek
Martins Ferry
Weitchpec, Wetchpeck or Weitspus

*982
The Square:

Northern Part: Pectah, Pactaw or Pektul Valley:
Norton Ranch
Mescat, Mascat, Miskut or Meskut Village
Soctish Ranch
Takinitlding Village, Hostler or Hosier
Tsewenalding or Senalton Village
Matilton or Medilding Village
Kentuck or Howunkut Village
Campbell Ranch
Tishtangatang or Djishtangading Village
Bennets Ranch
Spencers Ranch
J ackson Ranch
191. Jessie Dorothy Bristol Alameda. Born 1918; % blood Indian (y2 Yurok, % Hoopa). Born on the Connecting Strip and schooled there and on the Square. Pías lived on the Square full time since 1928. Listed in the reservation censuses from 1919 to 1940, the year of the last complete census. (Entitled to recover as an Indian of the reservation.)
192. Louisa Dowd Wilder Ames. Born 1889; y2 blood Indian ()4 Hoopa, 14 Yurok). Born on the Connecting Strip and schooled there and on the Square. Lived off the reservation from the time she first married, at a date which does not appear, to 1964. Has lived on the reservation since then. Was allotted on the Connecting Strip and was listed in all censuses from 1910 to 1940. (Entitled to recover as an Indian of the reservation.)
193. Bethema Billy Peters Polloeh Barber. Born 1913; full-blooded Indian (Yurok). Born on the Square and lived there until she was 8, when she moved with her family to her grandmother’s allotment on the Connecting Strip. Lived on the Connecting Strip to a date later than 1922, lived on the Square between 1936 and 1939, and now lives on the Connecting Strip. She has held an assignment of land on the Square, later transferred to her daughter, and was listed in the censuses from 1914 to 1940. (Entitled to recover as an Indian of the reservation.)
194. Lulu Smith Donnelly. Born 1883; full-blooded Indian (Yurok). Bom on the Connecting Strip and lived there until *983 1986. Since then has lived off the reservation. Allotted on the Connecting Strip and listed in the censuses from 1910 to 1940. (Entitled to recover as an Indian of the reservation.)
195. Frank A. Donley, also known as Frank Douglas. Born 1891; y2 blood Indian (Yurok). Bom on the Connecting Strip and lived there for 50 years. Now lives on the Lower Klamath Strip. Allotted on the Connecting Strip. Listed in the censuses for 1894, 1900, and from 1910 to 1940. (Entitled to recover as an Indian of the reservation.)
196. Ollie Roberts Sorrell Foseide. Bom 1921: full-blooded Indian (% Yurok, % Iloopa). Born on the Connecting Strip, lived there and schooled there and on the Square. Has lived on the Lower Klamath Strip and on the Connecting Strip. She was listed on the censuses from 1921 to 1940. (Entitled to recover as an Indian of the reservation.)
197. Ella Steve Hostler Johnson. Born 1900; full-blooded Indian (Yurok). Born on the Connecting Strip. Lived on the Square from 1916 to 1933 and thereafter on the Connecting Strip. She selected lands on the Square; the selection was later transferred to one of her sons. Two of her sons and her husband were allotted lands on the Square. She was listed on the censuses in 1900 and from 1910 to 1940. (Entitled to recover as an Indian of the reservation.)
198. Henrietta Wilma Hasten Lewis. Bom 1942; % blood Indian (Yurok). Bom off the reservation. Her father was % Indian (Yurok) and her mother was 100% Yurok, a native of the Connecting Strip. The plaintiff was born after the last complete census. Both her parents were listed on the censuses from 1920 to 1940. Schooled on the reservation. Has lived “most of her life” on the Connecting Strip. (Case to be retried because of the inconclusive nature of the data. New briefs should discuss the effect of birth off the reservation as affecting status, and the facts as to duration of residence off the reservation, and their significance.)
199. Llewellyn Markussen. Bom in 1932; % blood Indian (y2 Yurok, y^ Karok). Bom on the Square and lived there as an infant. From the age of 4 in 1936 until 1961 he lived on his mother’s assignment on the Square. Since then he has lived on the Connecting Strip. He was omitted from the *984 censuses because Iiis mother had never been listed. His mother was on her application enrolled as an Indian of the reservation in 1936 and was thereafter listed. (Entitled to recover as an Indian of the reservation.)
200. Theresa Billy Mitchell. Born 1891; full-blooded Indian (Yurok). Born on the Connecting Strip, lived on the Square as a child and since then has lived, for more than 50 years, on the Connecting Strip, where she was allotted. Listed in the censuses in 1900 and from 1910 to 1940. (Entitled to recover as an Indian of the reservation.)
201. George McOovey, Sr. Born 1917; % blood Indian (Yurok). Bom and schooled on the Connecting Strip. Lived on the Square from the time he was married in 1937 to 1969, when he returned to the Connecting Strip where he now lives. Listed in the censuses from 1918 to 1940. (Entitled to recover as an Indian of the reservation.)
202. Myrtle Smoher McOovey. Born in 1899; full-blooded Indian (Yurok). Bom on the Connecting Strip and schooled there, on the Square and elsewhere. Lived on her grandmother’s allotment on the Lower Klamath Strip from 1919 to 1964 and then moved to Klamath Glen, apparently also on the Lower Klamath Strip. She was listed on the censuses in 1900 and from 1910 to 1940. (Entitled to recover as an Indian of the reservation.)
203. Sadie Jones McOovey. Born 1891; full-blooded Indian (Yurok). Born on the Connecting Strip and lived there. Schooled there and on the Square. Has lived with her husband on his allotment on the Connecting Strip since her marriage in 1915. Has been listed on the censuses from 1915 to 1940. (Entitled to recover as an Indian of the reservation.)
204. Antone Ohie. Bom 1890; full-blooded Indian (Yurok). Bom on the Connecting Strip where he lived until 1964 and where he was allotted. In 1964 he moved to Hoopa where he now lives. Listed in the censuses in 1900 and from 1910 to 1940. (Entitled to recover as an Indian of the reservation.)
205. Erich William Pearson, Jr. Born 1931; % blood Indian (Yurok). Bom in Lassen County, California of parents one of whom was a non-Indian and the other a % Indian *985 (Yurok) native of the Square. He came to the Square at the age of 2, in 1933, and lived on land assigned to his mother in 1935. Moved in 1937 to a tract on the Square bought by his mother. Has lived on the Square since, except for military service between 1949 and 1951. He was listed on the 1940 census. (Case to be retried because of the inconclusive nature of the data. New briefs should discuss the effect of birth off the reservation as affecting status.)
206. Frances James Roberts. Born 1898; full-blooded Indian (% Yurok, % Hoopa). Born on the Connecting Strip and has lived on the Square, the Connecting Strip, and the Lower Klamath Strip. Listed on the censuses for 1900 and from 1910 to 1940. (Entitled to recover as an Indian of the reservation.)
207. Josephine Cooper Robinson Rogers Ludington Robinson. Bom 1896; % blood Indian (y2 Yurok, *4 Wintun). Born on the Square and lived on the Connecting Strip (except for a “short time” during her marriage) until 1959 when, apparently, she moved to Eureka, off the reservation. She had been omitted from the census and successfully applied for enrollment in 1933, whereupon she was able to accept an assignment on the Connecting Strip. She was listed on the censuses from 1934 to 1940. (Entitled to recover as an Indian of the reservation.)
208. Alta Mae Kane Rogers. Born 1933; full-blooded Indian (!4 Yurok, y2 Paiute). Bom on the Square and lived there and on the Connecting Strip until 1939 when she moved to her father’s reservation, the Bishop Indian Reservation. In 1953 she married and, with her husband, moved to the Connecting Strip and lived there until about 1966 when she and her husband moved to Bishop, California. Occasionally visits her cabin on the reservation. She was listed on the censuses from 1933-1940. (Case to be retried because of the inconclusive nature of the data. New briefs should discuss whether claimant has dual tribal status and, if so, the effect on the issue in the case.)
209. Florence Gensaw Green tShaughnessy. Bom 1902; y2 blood Indian (Yurok). Born on the Lower Klamath Strip and has lived there for 60 years except for “intermittent” pe *986 riods of residence in the Humboldt Bay Area. Listed in the censuses 1910 through 1940. (Entitled to recover as an Indian of the reservation.)
210. Jessie Quinn MeGoy Short. Born 1905 -J/% blood Indian (14 Hoopa, 14 Yurok). Born on the Connecting Strip and lived there las a child and after schooling at Hoopa. Presently resides off the reservation. Listed on the censuses 1910 through 1940. (Entitled to recover as an Indian of the reservation.)
211. Sam Smoker. Born 1904; % blood Indian (Yurok). Born on the Square and schooled there and on the Lower Klamath Strip. Has lived on the Square from 1914 to the present. He received a tract of land by assignment in 1985. Listed on the censuses 1910 through 1918. He was thereafter omitted until his application for enrollment was made and approved in 1932. Thereafter he was again listed, from 1932 through 1940. (Entitled to recover as an Indian of the reservation.)
212. EVwood Theodore Swanson. Born 1926; % blood Indian (Hoopa). Bom off the reservation. Lived part time with his grandmother at Hoopa from the time he was 8. At an unstated time his family moved to Hoopa and he completed grade and high school there; in that period he participated in Hoopa tribal ceremonial dances. He lived on the reservation until his military service; thereafter lived at his birthplace off the reservation. He inherited interests in three allotments on the reservation and sold them. (Case to be retried because of the inconclusive nature of the data. New briefs should discuss the effect of birth off the reservation as affecting status.)
213. Oscar Lawrence Taylor. Born 1908; half-blood Indian (Yurok). Born on the Lower Klamath Strip, schooled there and at Hoopa. Since then has lived on the Lower Kla-math Strip and for a time on the Connecting Strip, except when he was working off the reservation. Listed on the census rolls from 1910 to 1940. (Entitled to recover as an Indian of the reservation.)
214. Harry D. Timm Williams. Born 1924; half-blood Indian (Yurok). Born on the Lower Klamath Strip and lived there through high school until 1941 when he moved to *987 the San Francisco area where he took university extension courses. Spends weekends and vacations with his family on the reservation. Listed on the censuses 1930 through 1940. (Entitled to recover as an Indian of the reservation.)
215. Christopher 7owing. Born 1897; half-Indian (Yurok). Bom on the Connecting Strip and has lived there all his life. Presently lives there. Listed in the censuses 1900 and 1910 through 1940. (Entitled to recover as an Indian of the reservation.)
216. Laura Mareep Bam Billy Yoimg. Born 1891; full-blooded Indian (Yurok). Born and has lived on the reservation all her life, except while attending an Indian school. Listed on the censuses in 1900 and 1910 through 1940. (Entitled to recover as an Indian of the reservation.)

Ultimate Findings and Conclusions on the Individual Claims

217. Plaintiffs Louisa Dowd Wilder Ames, Jessie Dorothy Bristol Alameda, Rethema Billy Peters Pollock Barber, Lulu Smith Donnelly, Frank A. Donley, Ollie Roberts Sorrell Foseide, Ella Steve Hostler Johnson, Llewellyn Markussen, Theresa Billy Mitchell, George McCovey, Sr., Myrtle Smoker McCovey, Sadie Jones McCovey, Amtone Obie, Frances James Roberts, Josephine Cooper Robinson Rogers Ludington Robinson, Florence Gensaw Green Shaughnessy, Jessie Quinn McCoy Short, Sam Smoker, Oscar Lawrence Taylor, Harry D. Timm Williams, Christopher Young, and Laura Mareep Sam Billy Young are entitled to recover, as Indians of the Ploopa Valley Reservation, an aliquot share in the revenues of the unallotted trust-status lands of the entire reservation, in an amount to be determined in proceedings under rule 131 (c), the amount of recovery to be determined following trial of the claims of the remaining plaintiffs.
218. The claims of plaintiffs Henrietta Wilma Masten Lewis, Erick William Pearson, Jr., Alta Mae Kane Rogers and El wood Theodore Swanson are set down for retrial.
CONCLUSION OE LAW
The court adopts and makes part of its judgment the foregoing findings of fact and ultimate findings and conclu *988 sions. Certain of the plaintiffs are entitled to recover in •amounts to be determined under Rule 131 (c), and the claims of the others are set down for retrial in accordance with the opinion. The case is remanded to the trial judge for further proceedings.

 “By virtue of power vested In me by an act of Congress approved April 8, 1864, and acting under instructions from the Interior Department, dated at Washington City, D.C., April 26, 1864, concerning the location of four tracts of land for Indian reservations in the State of California, I do hereby proclaim and make known to all concerned that I have this day located an Indian reservation, to be known and called by the name and title of the Hoopa Valley Reservation, said reservation being situated on the Trinity River, in Klamath County, California, to be described by such metes and bounds as may hereafter be established by order of the Interior Department, subject to the approval of the President of the united States. Settlers in Hoopa Valley are hereby notified not to make any further Improvements upon their places, as they will be appraised and purchased as soon as the Interior Department may direct.”
“Austin Wilhv,

"Superintendent Indian Affairs for the State of California

“Fort Gaston, Cal., August SI, íseí"

 "To Whom It May Concern:

“Be It known that by virtue of power vested In me by Act of Congress passed April 8th, 1884, and acting under Instructions from the Department of the Interior, I have located and set aside for an Indian Reservation the following described tract of land to be known as the Hoopa Reservation: Beginning at a point where Trinity River flows into Hoopa Valley and following down said stream, extending six miles on each side thereof, to Its junction with Klamath River, as will be more particularly described by a map of said Reservation.
“Notice is hereby given to all persons not to settle or improve upon said Indian Reservation excepting as the Agent In charge may permit and in no manner to trespass thereon or Interfere therewith.
“Free transit through the Reservation will be permitted all travelers, pack-trains and stock, subject to such restrictions as the local Agent may see proper to Impose.
“Austin Wiley,

"Supt. Ind. Aff’s, Oal."

“Hoopa Reservation, Cal.

"February 18th 1885.”

 “Executive Mansion,

"June 23, 1878

“It Is hereby ordered that the south and west boundaries and that portion of the north boundary west of Trinity River surveyed, In 1875, by C. T. Bissel, and the courses and distances of the east boundary, and that portion of the north boundary east of Trinity River reported but not surveyed by him, viz: ‘Beginning at the southeast corner of the reservation at a post set In mound of rocks, marked ‘H. V. R., No. 3’; thence south 17% degrees west, 905.15 chains, to southeast corner of reservation; thence south 72% degrees west, 480 chains, to the mouth of Trinity River,’ be, and hereby are, declared to be the exterior boundaries of Hoopa Valley Indian Reservation, and the land embraced therein, an area of 89,572.43 acres, be, and hereby Is, withdrawn from public sale, and set apart for Indian purposes, as one of the Indian reservations authorized to be set apart, in California, by act of Congress approved April 8, 1864. (13 Stats., p. 39.)”
“Ü.S. Grant’

“Executive Mansion. October 16, 1891"
4 “It Is hereby ordered that the limits of the Hoopa Valley ¡Reservation in the state of California, a reservation duly set apart for Indian purposes, as one of the Indian reservations authorized to be set apart, In said State, by Act of Congress approved April 8, 1864, (13 Stats., 39), be and the same are hereby extended so as to Include a tract of country one mile in width on each side of the Klamath River, and extending from the present limits of the said Hoopa Valley reservation to the Pacific Ocean; Provided, however, That any tract or tracts included within the above described boundaries to which valid rights have attached under the laws of the united States are hereby excluded from the reservation as hereby extended.”
“Bbnj. Habeison”

 Findings are grouped and titled for convenience; neither placement nor title affects the findings, and a title does not necessarily describe all the findings which follow.